Gustof Charles FEYERS, and Gabrielle Feyers, Plaintiffs,

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 77-72591.

United States District Court, E.D. Michigan, S.D.

April 12, 1983.

Howard Silver, Southfield, Mich., for plaintiffs.

Carolyn Bell Harbin, Asst. U.S. Atty., Detroit, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER

ANNA DIGGS TAYLOR, District Judge.

This action is one for negligent personal injury filed pursuant to the Federal Tort Claims Act, which provides that the United States "shall be liable . . . in the same manner and to the same extent as a private individual under like circumstances" in accordance with the law of the state in which the alleged negligence has occurred. 28 U.S.C. § 2671 et seq.

Plaintiff Gustof Feyers commenced work at the Detroit Tank Arsenal in 1948, as a U.S. government employee. His duties then, in the roads and grounds department, included the mowing of grass, shoveling of snow, and general outside maintenance. Those duties were substantially the same on April 24, 1976, when he sustained the serious injury which precipitated this lawsuit. He was transferred to the payroll of the Chrysler Corporation in 1952, however, as the United States had contracted with that corporation to operate and produce vehicles for the government at the facility, of which the government retained ownership. Feyers had advanced in 1962 to the position of group leader as most senior of the grounds crew and, at some point in the late 1960's, he and his fellow groundsmen were given the added duties of occasional service as railroad switchmen. His classification was cement finisher. Switching duties were added to those informally expected of the grounds crew when Conrail ceased switching Department of Defense flatcars within the Tank Arsenal's railyard, and Chrysler overtook the operation of loading newly built M–60 tanks onto army flatcars, switching the cars among rail tracks with an army-owned locomotive as necessary, and heading them out to commercial rail lines.

Plaintiff sustained serious and permanent injuries to his right hand and forearm while attempting to couple two army flatcars in the army-owned, Chrysler-operated facility on April 24, 1976. He seeks to recover against the United States on four theories of Michigan law. They are:

1. A products liability claim based upon the allegedly defective condition of the flatcars which failed to couple automatically.

2. Negligent safety inspections by government personnel responsible under Chrysler's operations and productions contracts for monitoring safety conditions and practices pursuant to federal reservations of rights.

3. Negligent entrustment of dangerous instrumentalities (the flatcars and switching engines) to persons of whose incompetence it had notice.

4. The nondelegable duty of an owner to those who might be injured by the negligence of a contractor hired to perform an inherently dangerous activity.

The Judge to whom this case was first assigned granted the government summary judgment on two of the above theories: those of negligent entrustment and of the owner's liability for a contractor performing inherently dangerous work. The entrustment was found to be a discretionary governmental function, for which the United States cannot be held liable. See *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1952). The theory of liability for inherently dangerous work was held to be closely akin to strict or vicarious liability in Michigan law and therefore similarly barred as a basis of FTCA liability. See *McDonough v. General Motors,* 388 Mich. 430, 201 N.W.2d 609 (1970), and *Laird v. Nelms,* 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1971). On motion for rehearing, this court reinstated those two bases of plaintiff's claim for trial, which was held to the bench December 14 through 21, 1982 on all four claims.

After full consideration of all of the evidence presented and careful evaluation of the credibility of the witnesses, their demeanor and manner on the stand, and the

degree to which their testimony is supported both internally and by other credible evidence; and after review of the briefs of the parties and authorities cited therein, it appears to this court that it must enter judgment for plaintiff on the basis of the findings of fact and conclusions of law discussed below.

■■■ First, the court must dismiss plaintiff's claim of products liability, based upon one or more allegedly defective flatcars or couplers. The testimony was unanimous that those instrumentalities are not defective merely because the cars do not couple automatically when pushed together by a locomotive. That is a normal occurrence, and appears to be the chief reason for employment of switchmen. The court must also dismiss plaintiff's claim of negligent entrustment. The facts appear to support the government's argument that the decision to entrust the flatcars to Chrysler Corporation was indeed discretionary and therefore exempt, under *Dalehite, supra.*

It is clear to the court, however, that plaintiff must prevail on his theories of government negligence in monitoring Chrysler's safety program, and of government liability as owner for knowingly permitting the contractor's negligent performance of inherently dangerous activities *of which the government retained supervisory control* and during which the government maintained a continuing presence and oversight.

### FACTS

On the day of the accident, plaintiff and his three fellow grounds crew members were repairing flooring when their supervisor directed them to gather together three army flatcars which had been loaded with newly produced tanks and to align and attach them on a certain track, using the army locomotive, to be shipped away by a commercial railroad. Since Chrysler had taken over all railyard train movements in the 1960's the duties of switchman and engineer were performed by the grounds crew as necessary and as available by assignment on a seniority basis, because a higher rate

was paid for the work. Plaintiff testified quite credibly that "we just picked up" a way of performing switchmen's work, and "figured it out." When the government locomotive was brought for them to use, two "government men" taught the entire grounds crew how to operate it, and a Chrysler heavy equipment operator was given a locomotive operator's license. On the day of this accident that operator was away, however, and another heavy equipment operator, Barnett, was enlisted to drive the locomotive. Plaintiff has never heard of any safety rules for switching operations, never seen a manual, and never heard of a uniform set of signals. Neither had any of his fellow crew members, and his supervisor's testimony to the contrary is patently incredible and contradicted by every relevant fact of record.

As the most senior man of this crew, plaintiff was the "end man," or the man farthest from the engine who was directly at the point of each coupling. They assigned themselves their positions alongside the train, putting the newest man closest to the "engineer." The first two cars were coupled to the locomotive automatically, by backing the locomotive into the car, and pushing their couplers together. The third car, however, refused to couple in this manner. It stood on a curve in Track Number Six, which lay immediately adjacent to the building which housed the seven United States contract safety engineers responsible for Chrysler's safe performance of its contract.

Because of the curve in the track, the "engineer" could not see plaintiff, the end man. Plaintiff waved his hand, suggesting that the locomotive should be pulled forward for him to step between the cars and manually correct whatever problem had prevented the couplers from joining. The two other men on the ground passed on his wave to the engineer, who moved the locomotive forward an undisputed distance of three or four feet. Plaintiff stepped between the cars to adjust couplers while the two others alongside kept their hands raised at a "halt" attitude. Then Eovaldi, the

man nearest plaintiff, decided to walk back to see what plaintiff was doing, lowered his hand in doing so, led the next man to believe and to signal that it was time to backup the locomotive, which the "engineer" then did, and Eovaldi found plaintiff with his right hand and forearm crushed, pinned between the flatcars.

The witnesses, including government and Chrysler safety engineers and railroading experts as well as plaintiff's, agreed unanimously that the task of a switchman, specifically the coupling and uncoupling of railroad cars, is hazardous work. The defense argument here, however, is that plaintiff or any similarly situated workman should exercise "common sense" and not place himself in jeopardy between railcars or if so doing, should get clear when railcars are closing in on him. Therefore, it is argued, plaintiff himself was the sole cause of his injury. The court cannot accept such an argument.

The defense expert in railroading safety testified, as did plaintiff's experts, to the rigid regulation imposed by the federal government and the railroading industry itself upon the universally recognized extremely hazardous work of railswitching operations. Standard signals and methods are nationally promulgated and published, and required to be taught every operational railroading employee through the rigid and intensive training, examination, and biennial requalification programs undisputedly required to be conducted for the safety of such persons.

All experts also recognized the universal rule that railcars must be at least one car length apart before any switchman enters between, and the requirement that all railroaders be so trained. The government's railroad safety expert even testified, amazingly, that plaintiff was injured because he violated that rule by stepping between flatcars less than four feet apart and had no time to extricate himself. By some quirk of logic, however, that same expert refused to acknowledge that plaintiff and his fellow groundsmen should have been *told* of the rule. It is still the unswerving position of the government and its witnesses that plaintiff's common sense should have led him, by some marvelous coincidence, to all of the procedures and precautions which safety engineers have contributed to American railroading over the past half-century or more. That is a high tribute to plaintiff but a sad commentary on the engineers. It must further be noted that the uniform safety rules and procedures imposed by the federal government and the railroad industry upon commercial railroading are equally recognized and applied to industrial rail operations and to all U.S. Army rail operations.

The handbooks required to be given to every commercial railroad switchman, which are in evidence here, contain the identical handsignal directives which are found in the U.S. Army railroading manual which was available at the Army Safety Engineers' Office at the facility on which plaintiff was injured. Flatcar separation distances are equally enforced in both the public and private sectors, as is the cardinal rule that communications must never be broken between the switchman between cars and the engineer. Plaintiff's commonsense had indeed led him to request walkie-talkie radios, after he had seen Penn Central switchmen use them and prior to this accident, but his request fell upon deaf ears. No training was ever given to any of the Chrysler grounds crew in safe switching operations. The testimony of plaintiff roads and grounds supervisor, Osborne, to the contrary was patently false. If indeed he did teach safety procedures to the crew he could not recall even one at the time of trial and must have concocted them himself, inasmuch as he admittedly had never seen a manual.

The Chrysler Safety Administrator at the Detroit Arsenal Tank Plant testified that the government tank-building contract did require that he develop safety programs and that he had done so once, "years ago." He developed his safety program on a "priority basis," and he determined priorities on the basis of plant injury experience, not national statistics. Inasmuch as no injury

had occurred in the plant switching operation prior to plaintiff's, there was no safety program for the railyard, no safety inspection had ever been conducted therein, and no procedures had ever been reviewed. He was aware that the grounds crew had never been trained to perform the switching operations, and himself had no knowledge of the existence of standard signalling procedures.[1]

Mr. Robert Shirock had been the U.S. Army Safety Director for the Tank Automotive Command since 1962, at the time of plaintiff's accident. He is a highly educated, certified safety engineer who, with a staff of six subordinate safety engineers, maintained permanent offices in an Army building adjacent to the railyard. His offices included a safety library which in turn included Army Technical Manual 55–200, incorporating all national standard railroading procedures. He stated that he was responsible for the safety of all employees at the facility, Chrysler's as well as Army, and that his inspectors inspected for hazards and injurious conditions in Chrysler operations five days weekly, from 6:00 A.M. to 6:00 P.M. His duty was to monitor Chrysler's safety programs (which were required by contract to be developed) and to require corrections and improvements as he deemed necessary, by requests through the channels of the contracting offices of the respective parties. He testified that he knew in 1976 that railroading is hazardous, that training in signalling, distances, and flagman placement, is significant; and he knew of Chrysler's railyard operations. However, he knew nothing of the yardmen's training, had never conducted a safety conference concerning rail operations or had an inspection of the yard done; and he knew that no railroad safety program existed at Chrysler and had required none to be developed, although he acknowledged having authority to do so. It was Mr. Shirock's position that plaintiff's lack of commonsense had caused his accident. There had

been no necessity for a railyard safety program prior to plaintiff's accident, in his opinion, because there had never been an injury.

## CONCLUSIONS

■ Although the government correctly argues that its waiver of immunity under the FTCA may not be extended to include claims of vicarious liability, recent cases have held the United States liable for the negligence of its contractors where applicable state law imposed a nondelegable duty upon a principal to assure the non-negligent performance of inherently dangerous work. Where in such states, as here, the government has also reserved rights to inspect and knowingly permitted its contractor to utilize inexperienced or careless workers without requiring adequate safety precautions, the government is liable, not vicariously, but for its active negligence and breach of duty.

In *Rooney v. United States,* 634 F.2d 1238 (9th Cir.1980), where California law imposed liability upon a principal for the negligence of a contractor to whom an inherently dangerous activity was delegated, and where in addition the United States reserved inspection rights and knowingly permitted its contractor to operate without adequate safety controls, utilizing inexperienced workers, the United States was held liable for plaintiff's resultant injury.

Again, in *Barron v. United States,* 654 F.2d 644 (1981), the Ninth Circuit followed Hawaiian law in approving the active liability of a principal, albeit the United States, to the employee of a contractor performing extra-hazardous work. In *Barron,* the court noted the government's failure to take steps to eliminate the contractors' flagrant disregard of major safety requirements which were applicable to the work the plaintiff employee performed. The government's general retained control of that work, it held, made such failure a

---

1. The court can only note concerning the standard signals, having seen the experts demonstrate them, that they are at least as complex as the repertoire of a football referee and bear no relation to the casual hand-waving which plaintiff and his fellow groundsmen demonstrated that they had "made up" among themselves.

substantial breach of the government's duty.

If, then, Michigan law imposes active liability upon an owner or principal under such circumstance, it is appropriate that the government be held liable under FTCA. In *Funk v. General Motors*, 392 Mich. 91, 92, 220 N.W.2d 641 (1974); 28 USC 2674, Michigan's departure from the rule of *McDonough v. General Motors*, 388 Mich. 430, 201 N.W.2d 609 (1972), commenced, and its movement toward the California rule became apparent.

In *Funk, supra*, our Supreme Court recognized that ordinarily, an owner is not responsible for injuries caused by a carefully selected contractor to whom he has delegated an operation. That rule, however, is held to be "distinguished by the variety of its exceptions," which include circumstances in which the owner retains control of the work or in which by rule of law the duty to guard against the risk is made nondelegable. The court noted that General Motors, in that case, had exercised a high degree of control over the contractor's work, including provision of plans, specifications, and of an architectural-engineering superintendent who was "constantly on the premises and observed numerous tradesmen working on the beams with no nets or safety lines." (392 Mich. at 103, 220 N.W.2d 641). The court's holding was that:

> The law does not ... absolve an owner who acts in a superintending capacity and has knowledge of high degrees of risk faced by construction workers from responsibility for failure to require observance of reasonable safety precautions. 392 Mich. at 105, 220 N.W.2d 641.
>
> \* \* \* \* \* \*
>
> *In the area of job safety their knowing acquiescence in nonperformance encouraged, if not legitimized, the derelictions of the sub and general contractors.*
> GM is subject to liability because a jury could properly conclude that GM, despite its designation as owner, retained and exercised sufficient control so that it ought to be held responsible for its own negligence in failing to implement rea-

sonable safety precautions by the general contractor and subcontractor. (392 Mich. at 108, 220 N.W.2d 641, emphasis added.)

Then in *Dowell v. General Telephone Co.*, 85 Mich.App. 84, 270 N.W.2d 711 (1978), our Court of Appeals applied the *Funk* rule, defining the term "inherently dangerous" as:

> ... [t]hat type of danger which adheres in the instrumentality or condition at all times, thereby requiring special precautions to be taken with respect to it to prevent injury.
> Whether the activity being analyzed is "inherently dangerous" is thus a question of fact for the jury. 85 Mich.App. at 91, 270 N.W.2d 711.

The *Dowell* court wrote, further:

> As Mr. Justice Levin suggested in *Funk, supra*, [392 Mich.] at 104 [220 N.W.2d 641]: "The policy behind the law of torts is more than compensation of victims. It seeks also to encourage implementation of reasonable safeguards against risks of injury." Therefore, economic realities and public policy require that in some cases *de facto* control by the owner be recognized. 85 Mich.App. at 94, 270 N.W.2d 711.

The court then found that, inasmuch as the contract in question had reserved significant control to that defendant jury could have properly rested liability of the defendant on a finding of its retained control.

Again in *Signs v. Detroit Edison*, 93 Mich. App. 626, 287 N.W.2d 292 (1979), a principal which had placed an inspector at its contractor's jobsite whose function was to protect the safety and integrity of electric and gas installations was held to have exercised a sufficient degree of control to give rise to a duty to exercise reasonable care for the safety of the contractor's employees.

In *Duhame v. Kaiser Engineering, Inc.*, 102 Mich.App. 68, 300 N.W.2d 737 (1980), *leave denied*, 411 Mich. 955, our Michigan Court of Appeals held:

> There is a split of authority in this court on the issue of whether invocation of the "inherently dangerous activity doctrine"

can be construed as constituting a vicarious liability claim.

. . . (W)e believe that the better view is found in *Witucke v. Presque Isle Bank* 68 MichApp 559, 610; 243 NW2d 907 (1976), where this court held that the inherently dangerous activity doctrine presents a claim of active rather than passive negligence. 102 MichApp at 73, 300 NW2d 737.

Finally, in *Brown v. Unit Products, Inc.*, 105 Mich.App. 141, 306 N.W.2d 425 (1981), our Court of Appeals again noted that the trier of fact must determine whether an activity is inherently dangerous and further:

> We find that the allegation that defendant Unit Products engaged in an inherently dangerous activity is not an allegation of passive negligence or vicarious liability and so defendant Unit Products is precluded from receiving commonlaw indemnification. (105 Mich.App. at 141, 306 N.W.2d 425.)

■ So the law of Michigan places a nondelegable duty upon a principal to see that inherently dangerous activities conducted by his contractor are performed with the requisite degree of care, and where he permits the contractor to perform such work in a negligent manner the principal is actively negligent. Moreover, the law of Michigan also places liability upon the shoulders of a principal who retains control of contracted work for his failure to require necessary safety precautions.

■ In this case the inherently dangerous character of railroad switching work is virtually undisputed. Evidence of that fact is overwhelming and this court so finds. The degree of control which the United States exercised over Chrysler's performance of the tank production and facilities operation contracts is also exceptional. The entire facility, including buildings, railyard, locomotive and flatcars, were government-owned. The government maintains a large and permanent presence at the facility, including not only a large quality control and production oversight group, but a staff of seven safety engineers responsible for enforcement of the contract's requirements that all applicable safety laws, regulations and appropriate precautions be implemented. Those engineers maintained a perpetual, daily surveillance of the contractor's safety practices; but they never once concerned themselves with the railyard activities despite the Army Manual which rested on the shelves of their safety library. The Army's Chief Safety Engineer testified that it was within his authority to require, through channels, that a safety program be implemented in the railyard if he had deemed one necessary. The combination of factors here present clearly renders the United States liable for the negligence of its safety engineering staff in the making of inspections as well as for knowingly permitting a contractor to proceed in negligent disregard of the safety of the plaintiff.

■ We turn now to the question of damages. It is undisputed that the plaintiff sustained serious and permanent injuries which reduced his right hand and forearm to an essentially useless appendage. The court finds that plaintiff suffered extreme pain and suffering as a result of defendant's breach of its duty to him. As a result of the accident plaintiff suffered multiple lacerations of muscles and tendons and resultant dysfunction of all the nerves in this right forearm as well as multiple fractures which also impaired the arterial supply of blood to the hand. Several amputations were required to be performed on the digits of plaintiff's right hand.

Plaintiff has moreover required extensive surgery and psychological counseling as a result of his injuries. The quality of his life has been substantially diminished by his injuries. A man who has always worked with his hands, he is very conscious of the appearance of his right hand and ashamed of it. It was only at the insistence of counsel that plaintiff showed his hand to the court.

The evidence indicates that plaintiff's medical expenses totalled $18,319.21. He also sustained an earnings loss of $135,756.60. Based upon his life expectancy per

MCLA 500.834, plaintiff will have lost additional future wages totalling $75,768.00 by the time of his scheduled retirement age of 65 on January 13, 1986. His total economic loss, for which the government is responsible, is $229,843.81.

Based on the pain and suffering that plaintiff endured immediately following the accident, and the pain, suffering, and humiliation which will continue for him, the court finds it appropriate to award $200,-000.00 in compensatory damages to plaintiff.

▪ A separate award of damages is also recoverable for plaintiff's spouse, Gabrielle Feyers. As a consequence of her husband's injuries Mrs. Feyers has had to perform, and will continue to perform, the most basic tasks for plaintiff. Their married life, which was a happy, close, and highly traditional one, is sharply altered for the worse. The nature of the injuries suffered by plaintiff, and its impact upon Mrs. Feyers, requires this court to award her compensatory damages of $50,000.00.

On the basis of the findings of fact and conclusions of law outlined above, it is therefore ordered that judgment enter for plaintiff and against the United States in the amounts set forth above.

IT IS SO ORDERED.