Gustof Charles **FEYERS** and Gabrielle Feyers, Plaintiffs-Appellees,

v.

**UNITED STATES of America,** Defendant-Appellant.

No. 83–1402.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 18, 1984.

Decided Dec. 12, 1984.

Leonard R. Gilman, U.S. Atty., Carolyn Bell Harbin, Asst. U.S. Atty., Detroit, Mich.

Robert B. Nicholson, Marion L. Jetton (argued), Antitrust Div., Dept. of Justice, Washington, D.C., for defendant-appellant.

Howard Silver, Richard Toth (argued), Southfield, Mich., for plaintiffs-appellees.

Before KEITH and CONTIE, Circuit Judges and BROWN, Senior Circuit Judge.

CONTIE, Circuit Judge.

The United States appeals from a judgment rendered by the district court in favor of appellees Gustof and Gabrielle Feyers pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 2671–2680, on appellees' claims alleging negligent inspection of, and failure to provide safety training in, the railyard where Gustof Feyers was injured. Since we conclude that the district court lacked subject matter jurisdiction, we vacate the judgment of the district court and remand with instructions to dismiss.

## I.

Feyers was injured on April 24, 1976 while attempting to couple two United States Army flatcars at the Detroit Arsenal Tank Plant, part of the Detroit Tank Automotive Command in Warren, Michigan. Feyers was employed by Chrysler Corporation which operated the facility owned by the United States. One of Feyers' duties was that of railroad switchman. On the day of the accident, the flatcars would not couple automatically when pushed together. Therefore, Feyers signaled for the engineer to pull the engine forward so that Feyers could step in and correct the problem manually. While Feyers attempted to correct the problem, the other workmen between Feyers and the engine kept their hands raised to signal the engineer not to back up. However, the workman nearest Feyers lowered his hand as he went to help Feyers. Thereafter, each workman down the line lowered his hand, and the engine backed up crushing Feyers' right hand and forearm between the cars.

On October 28, 1977, the Feyers filed a complaint against the United States alleging that the flatcars were defective for failing to automatically couple; that the United States had negligently inspected Chrysler's operation of the facility; that the United States had negligently entrusted the flatcars to Chrysler; and that the United States breached its non-delegable duty to provide a safe work area. Trial was held to the court from December 14 to 21, 1982. On April 12, 1983, the district court rendered judgment in favor of the Feyers.[1] The court dismissed the product liability claim due to the lack of proof of defect, and the negligent entrustment claim on the ground that appellant's decision to entrust the cars to Chrysler was discretionary, and, therefore, the court had no jurisdiction over the claim. The court found that the inspection of the railyard by the government's safety officers was negligent and that the United States was liable for failing to provide safety training pursuant to the Michigan doctrines of nondelegable duty and retained control. The United States appeals.

1. *Feyers v. United States,* 561 F.Supp. 362 (E.D. Mich.1983).

## II.

We review below the facts pertinent to the government's challenge to the district court's jurisdiction over the Feyers' claims. The contract between the United States and Chrysler provided:

The Government and the Contractor shall each be responsible for maintaining a safety program in their areas of responsibility. The Government shall also make periodic spot reviews of the Contractor safety coverage in conjunction with the Government, with particular attention being directed to Government-owned buildings and/or equipment under the accountability and responsibility of the Contractor.[2]

Since 1967, the United States has maintained a Tank Automotive Command Safety Office of four to five persons in a building adjacent to the railroad. The office was responsible for the safety of Defense Department employees in neighboring states as well. At the time of the incident, this staff was headed by United States Army Safety Director Robert Shirock, a certified safety engineer. Shirock testified that the office initiated safety programs only for the Army employees at the Tank Command. The office monitored Chrysler safety procedure through an annual inspection. Shirock testified that safety priorities were based on accident experience, statistics and inspection deficiencies, and that there had been no personal injuries in the Chrysler railroad operation prior to Feyers' injury. Shirock emphasized that the United States had no input into hiring by Chrysler, no authority to designate which employees worked in the railroad operation, and the government did not know which employees were so assigned or their experience or training. Chrysler was required by the contract to comply with the provisions of AMC Safety Manual AMC 385–100, but Shirock testified that he had no authority to order Chrysler to modify its practices to comply with the terms of the Manual. The Manual did not include specific procedures to be used in railroad operations.

George E. Nolan, Jr., the procurement and administration officer for the United States who negotiated the contract, testified that the government had no responsibility to question Chrysler regarding the training of its employees. Nolan testified that the reference in the contract to "spot reviews" referred to the annual audit or inspection.[3] This limited review mechanism was included in the contract, according to Nolan, because Chrysler was perceived as a prudent contractor with a complex organization capable of managing its

---

**2.** Section J–5 of the contract provided in pertinent part:

It is the understanding and intent of the contracting parties that the Contractor shall endeavor to maintain the maximum degree of safety at all times in the operation of this plant. The Contractor shall comply with all applicable provisions of Local, State, and Federal ordinances (including OSHA), laws and building and construction codes, for that part of the work with the applicable provisions of the handbook, Safety, General Safety Requirements, 1 March 1967, approved by the Chief of Engineers, a copy of which has been furnished to the Contractor.... It is further recognized and agreed that the Contractor shall use said AMC Safety Manual AMC 385–100 as changed or amended as a guide in the operation of the plant. The parties in their endeavor to maintain the maximum degree of safety shall cooperate in all regards in the administration of the safety program and in developing and applying as mandatory those provisions of said Manual which are consist-

ent with the existing plant structure, facilities, and personnel resources when mutually agreed upon by the parties hereto. In any modification or alteration of the existing plant layout, structures, or equipment to meet requirements for additional production or changes in processing techniques for new items of production at the plant, the Contractor shall, incorporate in said plant modifications and alterations any safeguard prescribed by said Manual as changed or amended. The Contractor will maintain an accurate record of, and will report to the Contracting Officer, in the manner and on the forms prescribed by the Contracting Officer, exposure data and all accidents resulting in death, traumatic injury, occupational disease, and/or damage to property, materials, supplies, and equipment incident to work performed under this contract.

**3.** U.S. Safety Officer James Mayr, a member of Shirock's staff, testified in his deposition that "spot checks" could not be made in the plant since Chrysler security clearance was required.

safety programs. The Chrysler safety programs were monitored on an "as required" or "exception" basis, so that areas in which there were accidents were monitored first.

Edmond Mathews, Chrysler safety specialist, testified that resources were invested in training programs in areas with the highest accident rates, such as the tank driving program. Mathews testified that the interaction between the Chrysler Safety Office and United States' safety office was limited to Chrysler providing personnel to escort government inspectors through the plant during the annual inspection. Mathews confirmed that the government safety office could not order Chrysler employees to initiate safety measures, nor did government inspectors have access to the plant to monitor safety without an escort. Mathews testified that the United States had no role in hiring or determining the qualifications of Chrysler's safety specialists.

### III.

The United States contends that the district court lacked subject matter jurisdiction to consider the case since the Federal Tort Claims Act's waiver of sovereign immunity does not apply to discretionary acts by government employees. 28 U.S.C. § 2680(a).[4] The district court opinion indicates no ruling on whether the inspection by the government's employees or the failure to require safety training for railyard workers was a discretionary act depriving the district court of jurisdiction.

**4.** The United States also asserts that the district court erroneously held appellant vicariously liable for the negligent acts of its contractor; that the district court improperly applied the Michigan doctrines of nondelegable duty, retained control and comparative negligence; and that the district court erred in failing to reduce the award of future damages to present value. Because we conclude that the district court lacked jurisdiction, we do not consider these assignments of error.

**5.** 28 U.S.C. § 1346(b) provides:

Subject to the provisions of chapter 171 of this title, the district courts, together with the United States District Court for the District of

The United States can be sued only to the extent to which it has waived its sovereign immunity. *United States v. Orleans*, 425 U.S. 807, 814, 96 S.Ct. 1971, 1976, 48 L.Ed.2d 390 (1976). While the Federal Tort Claims Act, specifically 28 U.S.C. § 1346(b),[5] generally waives that immunity, 28 U.S.C. § 2680 reserves immunity in specific instances. 28 U.S.C. § 2680(a) provides:

The provision of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

If a case falls within the statutory exceptions of 28 U.S.C. § 2680, the court lacks subject matter jurisdiction. *Colorado Flying Academy, Inc. v. United States*, 724 F.2d 871, 875 (10th Cir.1984); *Miller v. United States*, 710 F.2d 656, 662 (10th Cir.), *cert. denied,* — U.S. —, 104 S.Ct. 352, 78 L.Ed.2d 316 (1983); *Carlyle v. U.S. Department of Army*, 674 F.2d 554, 556 (6th Cir.1982). The Feyers' claim that the United States was negligent in failing to provide safety training to the Chrysler workers essentially challenges the United States' delegation of safety responsibility to Chrysler. Therefore, the Feyers contend that the United States' decision to

the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

contract for Chrysler to provide safety programs for Chrysler employees did not constitute a discretionary function and that the United States, once having agreed to make inspections, was required to do so non-negligently.

Our resolution of this case follows the analysis of *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* —— U.S. ——, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), in which an airline and the owner of an aircraft brought an action challenging the Federal Aviation Administration's "spot check" system of compliance review, similar to the "spot review" included in the contract between the United States and Chrysler. The plaintiffs alleged, pursuant to the Federal Tort Claims Act, that the government was negligent in issuing certificates for aircraft that did not comply with applicable safety regulations. The plaintiffs alleged, as do the Feyers regarding Chrysler's safety practices, that the government's inspection process was negligent in failing to inspect certain aspects of the aircraft design. The United States in both cases contends that the basic responsibility for complying with safety standards had been delegated to a private party, the aircraft manufacturers and Chrysler, and that the government, through "spot checks," simply monitored compliance. *Id.* at 2766–67.

■ Whether the discretionary function exception applies in a case is governed by "the nature of the conduct, rather than the status of the actor." *Id.* at 2765.[6] "Thus, the basic inquiry concerning the application of the discretionary function exception is whether the challenged acts of a Government employee—whatever his or her rank—are of the nature and quality that Congress intended to shield from tort liability." *Id.* The congressional intent in enacting the exception was "to prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Id.*

The Court held that the decisions to delegate inspection responsibility to the manufacturer and to conduct "spot check" monitoring were discretionary decisions.

When an agency determines the extent to which it will supervise the safety procedures of private individuals, it is exercising discretionary regulatory authority of the most basic kind. Decisions as to the manner of enforcing regulations directly affect the feasibility and practicality of the Government's regulatory program; such decisions require the agency to establish priorities for the accomplishment of its policy objectives by balancing the objectives sought to be obtained against such practical considerations as staffing and funding. Here the FAA has determined that a program of "spot-checking" manufacturers' compliance with minimum safety standards best accommodates the goal of air transportation safety and the reality of finite agency resources. Judicial intervention in such decisionmaking through private tort suits would require the courts to "second-guess" the political, social and economic judgments of an agency exercising its regulatory function. It was precisely this sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent.

*Id.* at 2768. *Garbarino v. United States,* 666 F.2d 1061, 1065 (6th Cir.1981) ("... [T]he discretionary function exception also bars that portion of the claim based on the decision of the FAA to delegate inspection duties to an inspection department of the manufacturer"). *See Natural Gas Pipeline Co. v. United States,* 742 F.2d 502 (9th Cir.1984); *Madison v. United States,* 679

---

**6.** The Court in *Varig Airlines* reaffirmed its earlier interpretation of 28 U.S.C. § 2680(a) in *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953).

... [T]he "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

*Id.* at 35–36, 73 S.Ct. at 968 (footnotes omitted). *Varig Airlines,* 104 S.Ct. at 2764.

F.2d 736, 738–39 (8th Cir.1982) (awarding of government contract to contractor and promulgation of safety manual are discretionary functions); *Blaber v. United States,* 332 F.2d 629, 631 (2d Cir.1964) (delegation of safety responsibility to independent contractor is discretionary function); *Maltais v. United States,* 546 F.Supp. 96, 101 (N.D.N.Y.1982), *aff'd,* 729 F.2d 1442 (2d Cir.1983) (government decision to delegate safety responsibility to contractor is a discretionary function despite government's retention of the right to inspect and stop work).

■ The United States' decisions to delegate safety responsibility to Chrysler, to conduct only "spot checks" of Chrysler's safety programs, and to not institute a safety training program for railyard workers are clearly the type of discretionary functions protected by 28 U.S.C. § 2680(a). The evidence established that the United States' safety office was primarily responsible for the safety of government employees, that access to the plant by government inspectors to make "spot checks" was limited by the need for Chrysler security clearance, and that the United States' safety staff could not order Chrysler to change its safety practices. The government's safety director testified that safety decisions regarding specific areas of the plant were based on accident rates in those areas. The decision to rely on the "spot checks" or annual review along with accident rates to establish safety priorities is, in essence, a policy decision, involving the exercise of discretion. Although Chrysler was re-

quired to comply with the AMC Safety Manual AMC 385–100, that manual did not describe railroad safety procedures.[7] Further, the decision to delegate responsibility for safety to Chrysler was based on a perception by government negotiators that Chrysler was a prudent contractor capable of implementing its own safety program.[8] These facts establish that the acts cited in appellees' complaint constitute discretionary functions over which the district court lacked jurisdiction.

For the reasons expressed above, the judgment of the district court is VACATED and the case is REMANDED with instructions to dismiss appellees' complaint.

---

**7.** While the discretionary function exception does not apply where mandatory guidelines or regulations are violated, *Colorado Flying Academy, Inc.,* 724 F.2d at 875; *Jayvee Brand, Inc. v. United States,* 721 F.2d 385, 389 (D.C.Cir.1983); *Hylin v. United States,* 715 F.2d 1206, 1213 (7th Cir.1983); *Bergmann v. United States,* 689 F.2d 789, 792 (8th Cir.1982); *Reminga v. United States,* 631 F.2d 449, 456 (6th Cir.1980), this rule is inapplicable in this case since neither the AMC Safety Manual AMC 385–100 nor any other provision of the contract required specific safety measures in the railyard. *See Madison,* 679 F.2d at 739–40 (failure by United States to require compliance with safety manual was not a discretionary act where the government knew of the safety violations and specific safety precautions were required by the safety manual

incorporated by reference into the contract); *Barron v. United States,* 473 F.Supp. 1077, 1084 (D.Hawaii 1979), *modified,* 654 F.2d 644 (9th Cir.1981) (failure to correct safety problems not discretionary where contractor disregarded significant safety requirements of the contract). Further, the contract provided that the provisions of the Manual would be applied as mandatory only "when mutually agreed upon by the parties." *See supra,* note 3.

**8.** Similarly, in *Varig Airlines,* the Court noted that "[t]he FAA employees ... were specifically empowered to make policy judgments regarding the degree of confidence that might reasonably be placed in a given manufacturer." *Id.* at 2768.