James **BULTEMA**, Plaintiff,

v.

**UNITED STATES of America,**
**et al., Defendants.**

No. **4:01 CV 0951.**

United States District Court,
N.D. Ohio,
Eastern Division.

April 3, 2002.

Mark L. Wakefield, Lowe Eklund Wakefield Co., Cleveland, OH, for Plaintiff.

Marlon A. Primes, Office of the United States Attorney, Northern District of Ohio, Cleveland, OH, for Defendants.

## MEMORANDUM OPINION

DOWD, District Judge.

Before the Court is the defendants' amended motion for summary judgment,

with supporting exhibits. (Doc. Nos. 17, 18).[1] On March 7, 2002, plaintiff filed his memorandum in opposition. (Doc. No. 19).[2] The defendant filed a reply brief after obtaining leave of Court. (Doc. No. 26). For the reasons discussed below, the motion is granted.

## I. BACKGROUND

On April 19, 2001, James Bultema filed his complaint against the United States, Attorney General John Ashcroft, U.S. Attorney Emily Sweeney, and Kathleen Sawyer, who is the Director of the Bureau of Federal Prisons. He asserted a claim of negligence under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. 2671, *et seq.*,[3] over which this Court exercises jurisdiction pursuant to 28 U.S.C. § 1346(b).

Put simply, the facts are that Bultema was an inmate at the Federal Correctional Institution in Elkton, Ohio ("FCI"), serving a six-month sentence for bank fraud[4] when, on April 2, 1998, he fell from an upper bunk bed and severely injured his knee. The complaint alleges that the proximate cause of his injury was the neg-

ligence of Bureau of Prison personnel. Although that is a bare-bones description of the facts, the record before the Court provides considerably more detail.

On March 18, 1998, about three weeks after Bultema arrived at FCI to serve his 6–month sentence, he was examined by physician's assistant Danny Hall, as is routine for new inmates. (Bultema Dep. at 127; Hall Dep. at 18). Although Bultema was, by his own assessment, in "good health" (Bultema Dep. at 137),[5] Hall completed a form[6] indicating "no climbing" and that Bultema should be "allow[ed][a] bottom bunk" (Bultema Dep. at 139; Doc. No. 18, Part 8). Hall testified that it was his standard practice to give the inmate two copies of the form, instructing the inmate to keep one and give the other to his unit officer. Bultema's unit officer was Janel Fitzgerald. (Hall Dep. at 31; Fitzgerald Dep. at 112). Bultema's cellmate, Walter Brown, also testified that it was prison policy that the inmate would be given two forms, one to keep for himself and one to give to the officer in his unit. Brown himself followed this procedure to get his bottom bunk. (Brown Dep. at 12–13).[7] Notwithstanding this testimony re-

---

1. This document amends Doc. No. 16.

2. On December 26, 2001, the Court clearly ordered that responses to dispositive motions were due on February 22, 2002. This was an extension of the original date of January 28, 2002 which had been set at the Case Management Conference. Plaintiff sought neither an extension nor leave to file his opposition materials instanter. He simply filed the opposition, without any notice to the Court, as an officer of the Court, that it was untimely. Under other circumstances, the Court would strike this brief. However, the Court now places plaintiff and his counsel on notice that, hereafter, untimeliness will not be tolerated and, even if it means the plaintiff is prejudiced, untimely materials will be stricken from the record.

3. Bultema had filed an administrative claim, as required, but it was denied. (Compl. ¶ 3).

4. Although the record, in particular the deposition of Bultema, contains considerable information about how Bultema came to be convicted of this crime, none of those facts are relevant to the instant motion and need not be set forth here.

5. Bultema testified that he could perform various physical activities, including bending, sitting down, reaching up, running and walking. Even though he claim to be bothered by shooting pain in his lower back, he nonetheless played touch football almost daily for recreation. (Bultema Dep. at 108, 114–15, 137, 146–47).

6. This form is actually called an "Idle, Convalescent and Change in Work Classification Status" form. The parties have referred to it as a "bottom bunk pass." The Court shall do the same throughout this opinion.

7. In his opposition brief, Bultema misrepresents Brown's deposition testimony. He

garding the policy, Bultema says he only got one copy of the form and was never told to give it to anyone. (Bultema Dep. at 137–38). Therefore, he simply stored his copy in his locker and did not give it to anyone or tell anyone about it until after his fall and injury. (Bultema Dep. at 147–48; Fitzgerald Dep. at 112). He stated that he thought he would get the proper bunk bed "through the system[.]" (Bultema Dep. at 150).

On March 18, 1998, the medical restriction allowing Bultema to have a bottom bunk was entered into the prison's Sentry computer system, which was available to Fitzgerald. Even so, she admits that she never checked the computer prior to Bultema's fall and injury because she "didn't think there was any reason to." She testified that it would have been unwieldy to use the computer to independently discover specific facts about any given inmate (e.g., that he had been assigned to a bottom bunk) because that would require running several separate code searches for each inmate. She testified that, if she had to check the computer for such information, that is "all [she] would be doing." (Fitzgerald Dep. at 117). It was just easier for the inmate to tell her that he had been assigned to a bottom bunk and that was the policy. (*Id.* at 63–66).

The evidence is undisputed that lower bunks were highly sought after and that follow-up on a bottom-bunk assignment by any prison official was never necessary because prisoners assigned to lower bunks always made sure they told the unit officer that they were entitled to one. (Hall Dep. at 50). Bultema's cellmate testified that he never heard of any inmate being given a bottom bunk pass and then choosing to sleep in a top bunk. (Brown Dep. at 23–24). Bultema never told Fitzgerald about his bottom-bunk pass until after his injury. She was incredulous that he had not told her sooner. (Fitzgerald Dep. at 82, 118). She acknowledged that, had he told her, prison policy would have required that he be placed immediately in a bottom bunk and she would have done so. (*Id.* at 114).[8]

Even though he never got a bottom bunk "through the system" as he had expected, Bultema never complained about it to anyone, including his cellmate. (Brown Dep. at 150–51). Bultema acknowledged that he found Fitzgerald approachable and knew he could go to her if he had any problems (Bultema Dep. at 98), so he cannot argue that he was afraid to tell her about his bottom bunk pass. In fact, he *did* go to Fitzgerald about his *mattress,* complaining that it was uneven and asking for new one. (Bultema Dep. at 102; Fitz-

---

claims that Brown was *supposed* to be in a bottom bunk but did not get one until he fell out of a top bunk. (Doc. No. 19, at 7). That is not accurate. Brown testified that because he had a bad back and was very overweight, he believed he should have a bottom bunk, and *asked* for one, but never got it until he actually fell out of bed. At that time, he went to the medical unit where he was given a bottom bunk pass. (Brown Dep. at 46). He then followed the policy of giving one copy of the pass to his unit officer and he immediately got the bottom bunk assignment. (*Id.* at 12–13). Given the testimony that bottom bunks were in demand, it is not inconceivable that any given prisoner might *want* and even *ask for* a bottom bunk and be turned down until a

real need surfaced. In any event, Brown's testimony is clear that it was the policy that the inmate was supposed to tell his unit officer that he had medical clearance for a bottom bunk. Bultema never did this.

**8.** There were prisoners assigned to bottom bunks who had no medical need but were only there because they had asked for one and had priority on a "first-come-first-serve" basis. Fitzgerald referred to this as "seniority." (Fitzgerald Dep. at 102). When a medical need arose to assign another prisoner to a bottom bunk, apparently a prisoner without a medical need would be moved out and put back on the waiting list for a bottom bunk. (*See, e.g., id.* at 102–104).

gerald Dep. at 85–87, 90, 112). Fitzgerald offered to switch him to a different cubicle, but Bultema turned down the offer because he liked his cellmate. (Fitzgerald Dep. at 86–87). Bultema was later supplied with another mattress when one became available from a vacant bunk and other inmates brought it to him. (Bultema Dep. at 128–30). He never inquired whether this vacant bunk was a bottom bunk that he could switch to. (*Id.* at 134). The first night Bultema slept on this new mattress, he fell out of the top bunk and severely injured his knee. (*Id.* at 131).

There was also testimony that it was not that uncommon for inmates to fall out of the top bunks. (Brown Dep. at 36). Some (but not all) of the bunk beds had ladders to facilitate getting into the top bunk. Inmates often used prison tools to remove these ladders and reverse them so that they would protrude above the top bunk and help to supply a barrier to falling out. (*Id.* at 29–30, 35). Officers were aware that this was done and no one ever prevented it or required the ladders to be returned to their original condition. (*Id.* at 37).

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56. When considering a motion for summary judgment, "the inferences to be drawn from the underlying facts contained in [affidavits, pleadings, depositions, answers to interrogatories, and admissions] must be viewed in the light most favorable to the party opposing the motion." *U.S. v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). However, the adverse party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The Rule requires the nonmoving party who has the burden of proof at trial to oppose a proper summary judgment motion "by any of the kinds of evidentiary material listed in Rule 56(c), except the mere pleadings themselves[.]" *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). General averments or conclusory allegations of an affidavit do not create specific fact disputes for summary judgment purposes. *See Lujan v. National Wildlife Federation,* 497 U.S. 871, 888–89, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990). Nor may a party "create a factual issue by filing an affidavit, after a motion for summary judgment has been made, which contradicts … earlier deposition testimony." *Reid v. Sears Roebuck & Co.,* 790 F.2d 453, 460 (6th Cir.1986) (citing *Biechele v. Cedar Point, Inc.,* 747 F.2d 209, 215 (6th Cir.1984)). Further, " '[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.' " *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1477 (6th Cir.1989) (quoting *Anderson v. Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. 2505).

In sum, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby,* 477 U.S. at 250, 106 S.Ct. 2505.

## III. DISCUSSION

In his complaint, Bultema makes an FTCA claim for damages, asserting that his fall from the top bunk was due to

the negligence of prison authorities (Compl. ¶ 5), specifically, their "improper construction and assembly of the bunk bed in which Mr. Bultema was assigned the top bunk, specifically the ladder safety rails and the installation of a metal plate on the bottom bunk." (Compl. ¶ 6). In his response to the summary judgment motion, Bultema argues that the defendants were "negligent in two separate and distinct respects[.]" (Doc. No. 19, at 2). "The first was to require Mr. Bultema to sleep in a top bunk *after* he had been examined by Bureau of Prisons' personnel and it was medically determined he be required to sleep on a bottom bunk. After negligently failing to abide by their own mandated policies, the United States Government further negligently caused Mr. Bultema's injuries by failing to provide guardrails on the top bunk, notwithstanding an extensive history of inmates' falling from top bunks and injuring themselves." (*Id.*, emphasis in original). The defendants have addressed both prongs of the negligence claim in their motion.

The FTCA provides a limited waiver of the federal government's sovereign immunity "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).[9]

■ The FTCA waiver of immunity is subject to several exceptions, including the discretionary function exception at issue in this case. This exception precludes government liability for "[a]ny claim based upon ... the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). If the discretionary function applies, the FTCA claim must be dismissed for lack of subject matter jurisdiction. *Feyers v. United States*, 749 F.2d 1222, 1225 (6th Cir.1984); *see also, Rich v. United States*, 119 F.3d 447, 449 (6th Cir.1997), *cert. denied*, 523 U.S. 1047, 118 S.Ct. 1364, 140 L.Ed.2d 513 (1998).

■ If there is no applicable exception, then the FTCA claim of negligence is evaluated. The duty of care owed by the federal government to its prisoners is found in 18 U.S.C. § 4042.[10] In determin-

---

**9.** In *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963), the Supreme Court held that federal prisoners could bring an action under the FTCA for injuries sustained during their confinement by reason of the negligence of government employees. In so ruling, the Court rejected an argument that this would seriously impair the administration of federal prisons.

**10.** Section 4042 is captioned "Duties of Bureau of Prisons" and subsection (a) provides:

(a) **In general.**—The Bureau of Prisons, under the direction of the Attorney General, shall—

(1) have charge of the management and regulation of all Federal penal and correctional institutions;

(2) provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States, or held as witnesses or otherwise;

(3) provide for the protection, instruction, and discipline of all persons charged with or convicted of offenses against the United States;

(4) provide technical assistance to State and local government in the improvement of their correctional systems; and

(5) provide notice of release of prisoners in accordance with subsections (b) and (c).

ing whether the government has breached that duty, the Court must look to "the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b); *Flechsig v. United States,* 991 F.2d 300, 303–04 (6th Cir.1993). In this case, the Court would look to the essential elements of a negligence claim in Ohio, which include: (1) the defendant owed the plaintiff a duty; (2) the defendant breached that duty; and (3) such breach was the proximate cause of plaintiff's injuries. *Chambers v. St. Mary's School,* 82 Ohio St.3d 563, 565, 697 N.E.2d 198 (Ohio 1998); *Strother v. Hutchinson,* 67 Ohio St.2d 282, 285, 423 N.E.2d 467 (Ohio 1981).

■ The defendants first argue that there is no subject matter jurisdiction because the discretionary function exception to the FTCA applies. This argument has merit. There is a two-part test for determining the applicability of the FTCA's discretionary function exception:

> The first prong of the test calls for a "determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment of choice." *Rosebush v. United States,* 119 F.3d 438, 441 (6th Cir. 1997). If there is no controlling mandate, the court must conclude that the conduct involves discretion and the first prong of the test is satisfied for applying the discretionary function exception. The second prong of the test calls for the determination of whether the conduct was the type of conduct which the exception was designed to shield. *Id.* at 443. "Congress wished to prevent judicial 'second guessing' of legislative and administrative decisions grounded in social, economic, and political policy." *Id.* at 441 (quoting *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984)). Therefore, "where there is

room for policy judgment and decision, there is discretion of the sort protected by Section 2680(a)." *Id.*

*Reetz v. United States,* 224 F.3d 794, 795 (6th Cir.2000).

Bultema argues that there was no discretion here because, under FCI's policy, if he was medically assigned a lower bunk, he was supposed to have one. He claims that his bottom bunk assignment should have been properly communicated to Fitzgerald, or that she should have discovered it by checking the computer, and that she had no discretion with respect to his bunk assignment.

■ Bultema's argument misses the mark. The issue is not whether Fitzgerald had discretion; rather, when deciding whether the first prong of the discretionary function test is met, the issue is whether there is generally any federal statute, policy, regulation or the like that *requires* a particular method for assignment of quarters (i.e., bunks and cells) in a federal prison or whether that is simply left to the discretion of individual prison authorities. "The exception covers only acts that are discretionary in nature, acts that 'involv[e] an element of judgment or choice,' ...; and 'it is the nature of the conduct, rather than the status of the actor' that governs whether the exception applies." *United States v. Gaubert,* 499 U.S. 315, 322, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991) (internal citations omitted).

Here, there is no statute, policy or regulation which mandates a particular method for assigning bunks in prison; further, the plaintiff has not argued that there is. The only constraint is Section 4042(a) which provides that the Bureau of Prisons has a duty to provide "suitable quarters and provide for the safekeeping, care, and subsistence" of prisoners. The precise contours of *how* this is accomplished is left to the discretion of prison authorities, notwith-

standing the fact that many individual people (including inmates and even this Court) might have their own opinions has to how that discretion *should* be exercised. The first prong of the test is met.

■ Even where the challenged conduct involves an element of judgment or discretion, the second prong of the test must also be met; that is, the Court must look at whether that judgment is of the kind the discretionary function exception was designed to shield. Here, that test is met. The purpose of the exception is to "prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort[.]" *Gaubert*, 499 U.S. at 323, 111 S.Ct. 1267 (internal quotations marks and citations omitted).

■ It has been said that prison administrators should be given wide-ranging deference in adopting and executing prison policies. *See Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979). Here, the policy-makers apparently decided that the quickest and most efficient method for communicating a medically-necessary bottom bunk assignment to the unit officer was to utilize the inmate himself. There is no federal statute or regulation or policy that forbids this method of operation. In fact, this policy has intuitive appeal especially where, as here, it deals with something that every inmate apparently wants, i.e., a bottom bunk. Who would have the greater interest in making sure that his bottom bunk pass is brought to the attention of the unit officer: the inmate or medical personnel? Clearly, the inmate has the greater interest. There is no reason to believe that an inmate with a true medical need would *not* tell his unit officer that he had been given a pass for a

bottom bunk *and* there is equally no reason to require a unit officer to sit all day at her computer conducting code searches to *discover* information which the inmate can *tell* her in a matter of seconds.

Even if this Court were not persuaded that this is an effective policy, one which is actually most likely to protect inmates from "falling through the cracks" as far as bunk assignments go, that is not the issue. The issue is whether there is discretion and whether that discretion is of the kind that was intended to be protected by the discretionary function exception. Here, the answer is in the affirmative.

■ Further, with respect to plaintiff's claim that the bunk beds should have had ladders and/or guardrails, this, too, is a discretionary call to be made by prison administrators. There were valid safety and security concerns relating to the beds at issue. Guard rails, and sometimes ladders, are not included because of the danger that they can be broken off and used as weapons or escape devices. (*See* LaManna Decl. ¶ 3).[11] These, again, are matters best left to the judgment of prison administrators who are in a position to know the security needs of their particular institutions.

For the above-discussed reasons, the Court concludes that the discretionary function exception to the FTCA applies and deprives the Court of subject matter jurisdiction. For that reason, the defendants are entitled to summary judgment.

■ Even if the Court is wrong about the applicability of the discretionary function exception, Bultema would not prevail on the merits of his FTCA negligence claim because of his *own* negligence. Ohio's comparative negligence statute, O.R.C. § 2315.19(A), bars recovery by a

---

**11.** At all relevant times, John LaManna was the Warden at Elkton. He is now the warden at a different federal correctional facility in McLean, VA. (*See* Doc. No. 18, Part 5).

plaintiff if his own contributory negligence is greater than the defendant's negligence. In that case, a plaintiff's own negligence is the legal, that is, proximate, cause of his injury and the third element of Ohio's test for negligence would fail.

Bultema's own testimony in this regard is the strongest evidence against his recovery on this claim: he was medically recommended for a lower bunk but, contrary to prison policy, apparent verbal instructions to do so, and just plain common sense, he *never* told his unit officer or gave her the written recommendation or, for that matter, complained when he did not get a lower bunk.[12] Further, he had at least one opportunity to switch to a different bunk but did not want to pursue it for fear of losing his cellmate. Instead, he decided to simply settle for a new mattress.

 It is clear that plaintiff had opportunities to protect himself from the hazard of being in a top bunk and failed to do so. Ohio courts have frequently determined that summary judgment is appropriate where a person fails to protect himself from an obvious hazard or takes actions that place himself in danger. *See, e.g., Mitchell v. Ross*, 14 Ohio App.3d 75, 470 N.E.2d 245 (1984); *Sidle v. Humphrey*, 13 Ohio St.2d 45, 233 N.E.2d 589 (1968); *Paschal v. Rite Aid Pharmacy*, 18 Ohio St.3d 203, 480 N.E.2d 474 (1985).[13] Further, summary judgment may be granted even in a comparative negligence situation. *See, e.g., Barnett v. Carr*, No. CA2000–11–219, 2001 WL 1078980, at *9 (Ohio App. 12 Dist., Sept. 17, 2001) (summary judgment is properly granted in favor of defendant where the trial court can determine as a matter of law that plaintiff's own negligence outweighs any negligence of the defendant).

Here, it was not the system that resulted in Bultema's injury.[14] If he had properly followed the system, he would have had a bottom bunk. It was his own inexplicable failure to comply with the system, even when he had opportunities to do so, that was the proximate cause of his injury. Therefore, even if the discretionary function exception does not apply to deprive this Court of subject matter jurisdiction, the defendants are still entitled to summary judgment on the negligence claim.

## IV. CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment is granted.

IT IS SO ORDERED.

### JUDGMENT ENTRY

For the reasons set forth in the Memorandum Opinion filed contemporaneously with this Judgment Entry, IT IS HEREBY ORDERED, ADJUDGED and DE-

---

12. Bultema also testified that he found Fitzgerald to be friendly and approachable (Bultema Dep. at 97–98, 101, 118, 125), so there can be no claim that he was somehow intimidated into not complaining. In fact, he affirmatively testified that he was not afraid to go to her to ask for something. (*Id.* at 125). Furthermore, Bultema was an educated man who was accustomed to being in charge. He had, during his pre-incarceration employment, held several supervisory positions, including management of a Fortune 500 insurance company. It is unlikely that he was incapable of speaking up for himself or, for that matter, incapable of understanding the system.

13. Bultema testified that, although he never told anyone about it, he had a fear of falling out of the bunk bed after another inmate was injured when doing so. (Bultema Dep. at 172).

14. This is not a case like many prison cases where, precisely because of the nature of confinement, an inmate can do nothing to protect himself and needs the assistance of prison personnel. Here, all Bultema had to do was *tell someone* that he had a bottom bunk pass.

CREED that summary judgment is entered in favor of all the defendants. Case closed, with each party to bear its own costs.