**Marlys BEAR MEDICINE and Delores Iron Shirt, as Co–Personal Representatives of the Estate of Leland Kicking Woman, George Kicking Woman, Molly Kicking Woman, Marlys Bear Medicine, individually and as guardian of Tanielle Kicking Woman and George Lee Kicking Woman, II, and Dana Murray, as guardian of Brandi Kicking Woman, Susan Kicking Woman, Lissa Kicking Woman, and Leland Kicking Woman, Jr., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

**No. CV–95–100–GF–PGH.**

United States District Court, D. Montana, Great Falls Division.

April 21, 1999.

---

Joe R. Bottomly, Bottomly Law Offices, Kalispell, MT, Monte D. Beck, Beck Law Office, Bozeman, MT, for plaintiffs.

George F. Darragh, Jr., Office of the U.S. Attorney, Great Falls, MT, for The United States, acting by and through the Secretary of the Department of Interior, Bureau of Indian Affairs, defendant.

George F. Darragh, Jr., Office of the U.S. Attorney, Great Falls, MT, for U.S. Dept. of Interior.

William J. Gregoire, Stephanie A. Reinhardt, Smith, Walsh, Clarke & Gregoire, Great Falls, MT, for Bailey Peterson, Lone Bear Logging, third-party defendant.

## MEMORANDUM AND ORDER

HATFIELD, Senior District Judge.

The present action has its genesis in a logging accident on the Blackfeet Indian Reservation which ultimately resulted in the death of Leland Kicking Woman. Plaintiffs Marlys Bear Medicine and Delores Iron Shirt, as co-personal representatives of the Estate of Leland Kicking Woman, and Marlys Bear Medicine and

Dana Murray, as guardians of Kicking Woman's minor children, and Molly and George Kicking Woman, as Kicking Woman's parents, bring this action under the Federal Tort Claims Act, 28 U.S.C. § 1346(b), §§ 2671 *et seq.* ("FTCA"), seeking monetary compensation based upon the negligence of the defendant United States, acting through the Bureau of Indian Affairs ("BIA"). Plaintiffs allege, *inter alia,* that the BIA negligently failed to manage and supervise the safety aspects of logging operations conducted by Bailey Peterson, d/b/a as Lone Bear Logging ("Lone Bear").[1]

Presently before the court are defendant's motion to dismiss, or, in the alternative, motion for summary judgment, and plaintiffs' cross-motion for summary judgment. Having reviewed the record, the court is prepared to rule.

## BACKGROUND

The accident giving rise to this action occurred on October 6, 1993. Lone Bear was cutting timber at the Valentine Logging Unit on the Blackfeet Indian Reservation pursuant to a timber contract executed between Lone Bear and the Blackfeet Tribe.[2] The BIA approved the contract in accordance with its duties as manager of the Indian forest land on the Blackfeet Indian Reservation.[3] *See,* 25 C.F.R. §§ 163.10; 163.20(a).

At the time of the accident, Lone Bear's logging crew consisted of three sawyers: Malcolm New Robe, Quentin New Robe and Dwayne Mittens. Leland Kicking Woman was at the logging site for a "try out" to replace Malcolm New Robe, who had been injured in an automobile accident.[4] While Kicking Woman and Malcolm New Robe were walking around the job site, they stopped to watch Quentin New Robe fell a tree. As the tree began to fall, a gust of wind pushed the tree off its intended course, and in the direction of Kicking Woman and Malcolm New Robe. Although Malcolm thought he and Kicking Woman were more than one tree length away from Quentin, he was wrong. The upper branches of the tree struck Kicking Woman, knocking him to the ground. Kicking Woman was subsequently transported to the hospital in Browning, Montana, where he was diagnosed with a spinal cord injury rendering him a quadriplegic. Following nine months of hospitalization, Kicking Woman died of complications from his injuries and hospitalization. The present action followed.

Relying upon the FTCA, plaintiffs assert a number of negligence claims against the government. First, plaintiffs allege the BIA, through its employees, acted negligently when it entrusted timber cutting to Lone Bear. Second, plaintiffs allege the BIA negligently failed to supervise and

1. Lone Bear was previously named as a third-party defendant in this action. When plaintiffs settled their claims against Lone Bear, the third-party complaint was dismissed by order of this court dated August 26, 1998.

2. Under the terms of the timber contract, the Blackfeet Tribe agreed to sell 99.9 million board feet of conifer sawlogs and 13.0 million board feet of firewood located on a 9.3 acre area within the Valentine Logging Unit. *See,* timber contract, paras. A6, A7.

3. The Department of Interior, acting through the BIA, has a fiduciary responsibility to preserve and manage the forests located within the exterior boundaries of the Blackfeet Indian Reservation for the benefit of the Blackfeet Tribe and it members, and ensure the tribe receives a fair economic benefit for any timber it sells. *See, United States v. Mitchell,* 463 U.S. 206, 103 S.Ct. 2961, 77 L.Ed.2d 580

(1983); 25 C.F.R. § 163.3. Pursuant to that fiduciary duty, the BIA manages the harvesting of Indian timber on the Blackfeet Indian Reservation through its authority to approve and reject timber contracts executed between the Blackfeet Tribe and timber purchasers. *See,* 25 U.S.C. §§ 405–07; 53 BIA Manual Supplement 3, Sections 3.1 and 3.2; 25 C.F.R. § 163.20(a).

4. The parties do not agree on whether Kicking Woman was an employee of Lone Bear at the time of the accident. Plaintiffs contend Kicking Woman was a newly hired employee of Lone Bear. The government contends Kicking Woman was not yet hired. For purposes of this Memorandum and Order, the court will assume Kicking Woman was an employee of Lone Bear.

manage the safety aspects of Lone Bear's logging operation. Third, plaintiffs allege the BIA violated a non-delegable duty to ensure that Lone Bear utilized appropriate safety precautions to protect its employees and business invitees while conducting logging operations in an area notorious for unpredictable winds. Fourth, plaintiffs allege the BIA negligently failed in its duty to require that Lone Bear purchase liability insurance and workers compensation insurance for the benefit of its employees and others.

The government argues the FTCA claims advanced by the plaintiffs should be dismissed for three reasons. First, some of the claims are barred because there is no analogous state liability under similar circumstances, which is a prerequisite to the imposition of liability under the FTCA. Second, some of the claims are barred by the "discretionary function exception" to the FTCA. *See,* 28 U.S.C. § 2680(a). Third, some of the claims are barred because they are premised upon the purported negligence of persons other than government employees, and the government cannot be held vicariously liable for the negligent acts of third parties.

## DISCUSSION

### A. *Failure to Ensure that Lone Bear Utilized Appropriate Safety Precautions*

Plaintiffs contend the BIA, as the governmental agency approving the timber sale, had a nondelegable duty under Montana law to ensure Lone Bear used appropriate safety precautions in carrying out its logging operation, and breached the duty when it failed to ensure that Lone Bear complied with safety standards applicable to the logging industry.

The FTCA provides the United States may be held liable in tort when a federal employee is negligent in the scope of his employment "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." *See,* 28 U.S.C. §§ 1346(b), 2674. Accordingly, liability may be imposed under the FTCA only if analogous liability exists under Montana law. *See,* 28 U.S.C. § 1346(b); *Gardner v. United States,* 780 F.2d 835, 837 (9th Cir.1986). The duty which arises from the trust relationship extant between an Indian tribe and the United States is unique with no analogous duty under Montana law. Therefore, the FTCA is inapplicable.

Assuming, *arguendo,* that an analogous duty exists under Montana law, the court, after appropriate analysis, concludes the United States would not be liable under Montana law. In Montana, a project owner or general contractor is ordinarily not liable for injuries incurred by the employees of a subcontractor or independent contractor. *See, Kemp v. Bechtel Construction Company,* 221 Mont. 519, 720 P.2d 270, 274 (1986). One exception to this rule, commonly referred to as the "inherently dangerous" exception, applies where a subcontractor is performing inherently dangerous work, and the project owner or general contractor should reasonably have known of the inherent danger. *See, Kemp,* 720 P.2d at 274–75. Under such circumstances, the project owner or general contractor has a nondelegable duty to ensure the independent contractor employs proper safety precautions.[5] *See,*

---

5. Montana's "inherently dangerous" exception is premised upon sections 416 and 427 of the Restatement (Second) of Torts. Section 416 provides as follows:
§ 416. **Work Dangerous in Absence of Special Precautions**
One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise.
Section 427 provides as follows:
§ 427. **Negligence as to Danger Inherent in the Work**

*McCall v. United States Dep't of Energy Through Bonneville Power Administration*, 914 F.2d 191, 193–95 (9th Cir.1990). If a government agency is the general contractor or project owner and an independent contractor is conducting an inherently dangerous activity, the United States may be liable under the FTCA for violating a nondelegable duty to ensure the independent contractor employs the proper safety precautions. *See, McMillan v. United States*, 112 F.3d 1040 (9th Cir. 1997).[6]

■ In order for the inherently dangerous exception to apply, the work undertaken by the independent contractor must present a peculiar risk of harm which requires "special" safety precautions, rather than "standard" safety precautions. *See, Crane, supra*, 41 F.3d at 552 (9th Cir. 1994). Restated, if the risk of harm presented by the independent contractor's work or activity presents "no peculiar risk or inherent danger when standard safety precautions are taken", the work or activity in question is not inherently dangerous. *McMillan, supra*, 112 F.3d at 1043 (9th Cir.1997), *citing, Micheletto v. State*, 244 Mont. 483, 798 P.2d 989, 993–94 (1990); *Kemp v. Big Horn County Elec. Coop.*, 244 Mont. 437, 798 P.2d 999, 1003–04 (1990).[7]

In the case *sub judice*, the pertinent facts are undisputed. Kicking Woman was observing the felling of a tree by a fellow sawyer, Quentin New Robe. As the tree began to fall, a gust of wind blew the tree off its intended course, causing it to strike Kicking Woman. Kicking Woman was standing less than one tree length from Quentin New Robe when he was struck by the tree. Plaintiffs contend the logging operations at issue were inherently dangerous because Lone Bear was logging in an area known to have gusty and unpredictable winds, and the loggers employed by Lone Bear were inexperienced and lacked appropriate safety training.

■ While the court agrees that all logging activities involve an element of danger, and that cutting timber in the Valentine Logging Unit on a windy day, with inexperienced sawyers, increases the risk a tree could fall in an unintended direction and strike an observer, the court does not agree the logging activity at issue in this case was inherently dangerous. The logging activity contemplated in the timber contract presented *no peculiar risk or. inherent danger which required "special" safety precautions. Rather, the risk of danger arose out of the failure to use standard safety precautions. If Kicking Woman would have been standing more than one tree length from Quentin New Robe when New Robe felled the tree, Kicking Woman would not have been injured, despite the effects of the wind or New Robe's lack of experience and safety

---

One who employs an independent contractor to do work involving a special danger to others which the employer knows or has reason to know to be inherent in or normal to the work, or which he contemplates or has reason to contemplate when making the contract, is subject to liability for physical harm caused to such others by the contractor's failure to take reasonable precautions against such danger.

6. Plaintiffs assume, without citation to applicable authority, that the BIA was an owner of the timber cut by Lone Bear. Because the government does not cite any authority to the contrary, the court will assume, for purposes of this Memorandum and Order, that the BIA was a project owner.
The liability imposed upon a project owner or general contractor for breach of a nondelega-

ble duty is direct liability, and is not a vicarious liability based upon the negligent act of a subcontractor or independent contractor. It stems from the duty of the project owner or general contractor to exercise reasonable care to ensure the subcontractor or independent contractor abides by his safety responsibilities. *See, Gardner v. United States*, 780 F.2d 835, 837 (9th Cir.1986).

7. Generally, the issue of whether an activity is inherently dangerous is a question of fact to be determined by the finder of fact. *See, McMillan, supra*, 112 F.3d at 1044. However, if the historical facts are undisputed and reasonable minds could not differ, the issue becomes an issue of law for the court to resolve. *Id.*

training. Accordingly, the court concludes the BIA did not have a nondelegable duty under Montana law to ensure Lone Bear employed proper safety precautions. The negligence claim, which is premised upon a nondelegable duty, must necessarily fail.

In support of their contention that Lone Bear's logging activity was inherently dangerous, plaintiffs' rely heavily on *McMillan*, wherein this court, the Honorable Charles C. Lovell presiding, and later the Ninth Circuit Court of Appeals, concluded the logging activities in that case were inherently dangerous. Judge Lovell's pronouncements, and those of the Ninth Circuit of Appeals, fail to support plaintiffs' position, because the logging activity in *McMillan* is distinguishable from the logging activity in the present case. In *McMillan*, the plaintiff and a fellow sawyer were cutting a right-of-way corridor for a roadway to be constructed in the Kootenai National Forest. All of the trees in the right-of-way corridor had to be cut. At least 20% of the trees in the right-of-way were snags (dead standing trees).

The cutting of a right-of-way corridor involves each sawyer selecting a section of the corridor ranging in length from 500 to 1,000 feet. When a sawyer completes felling all the trees in a strip, he must pass all of the sawyers who are ahead of him to move further up the right-of-way corridor to begin a new strip. As McMillan was moving to a new strip, he stopped near a strip being cut by a fellow sawyer to wait for the sawyer to fell a tree. McMillan's location was more than one tree length away from the sawyer, but less than two tree lengths. The sawyer felled a snag into a group of trees in the right-of-way, causing a snag in the group to fall out of the right-of-way and strike McMillan. *McMillan*, 112 F.3d at 1046.

The logging activity in *McMillan* was inherently dangerous because of the high number of snags in the right-of-way corridor which had to be cut, and the necessity of sawyers passing one another as they progress down the right-of-way. *Id.* The felling of snags is inherently dangerous

because vibrations created by felling other trees can cause portions of or entire snags to fall. This can occur minutes after a nearby tree has been felled, creating a silent, delayed hazard. Also, because snags, by definition, are dead, they are in the process of structural decay: the center may be hollow, roots may be rotten, and limbs and tops may be decayed and easily broken off, potentially falling on the sawyer. Because of the dangerous nature of the snags, they have been dubbed "widowmakers." Finally, due to their unpredictable nature, and the lack of weight in their upper support branches, snags are particularly difficult to directionally fell. *Id.*, 112 F.3d at 1045.

The injury sustained by Kicking Woman was not caused by the felling of snags in a restricted area where sawyers were required to work in close proximity to one another. Thus, plaintiffs' reliance on *McMillan* is misplaced.

### B. *Discretionary Function Exception*

■ Section 2680 of Title 28 describes several exceptions to the government's liability under the FTCA. When a claim falls within an exception to the FTCA's waiver of sovereign immunity, the court is without subject matter jurisdiction to hear the case. *Mundy v. United States*, 983 F.2d 950, 952 (9th Cir.1993). The BIA contends the negligence claims based upon the decision to entrust timber cutting to Lone Bear, the decision not to manage or supervise the safety aspects of Lone Bear's logging operation, and the BIA's decision not to require that Lone Bear purchase liability insurance and/or workers compensation insurance, are barred by the discretionary function exception to the FTCA. *See*, 28 U.S.C. § 2680(a).

The discretionary function exception operates as the foremost limitation on a Court's jurisdiction under the FTCA. The discretionary function exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain

governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 808, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984). It withholds jurisdiction over any claim "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *See,* 28 U.S.C. 2680(a).

The purpose of the exception is to "prevent judicial 'second-guessing' of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Varig Airlines,* 467 U.S. at 814, 104 S.Ct. 2755. If a discretionary function is involved, the fact a decision was negligently made will not bring the challenged conduct outside the exception. *Ayer v. United States,* 902 F.2d 1038, 1041 (1st Cir. 1990). The exception applies to policy decisions made at both the operational and planning levels of a federal agency. *See, United States v. Gaubert,* 499 U.S. 315, 332, 111 S.Ct. 1267, 113 L.Ed.2d 335 (1991); *Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The fact that determinations are made at a relatively low level in a federal agency does not preclude the application of the discretionary, function exception. *See, Gaubert,* 499 U.S. at 332, 111 S.Ct. 1267.

To determine whether a claim is barred by the discretionary function exception, the court must apply the two-part test announced in *Berkovitz v. United States,* 486 U.S. 531, 536, 108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). First, a court must determine whether the challenged conduct involves an element of choice or judgment for the acting employee. The discretionary, function exception does not

apply if a "federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow," because the employee has no rightful option but to adhere to the directive.[8] *Prescott v. United States,* 959 F.2d 793, 798 (9th Cir.1992), *quoting, Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. If the challenged conduct is not discretionary, the exception does not apply and immunity does not attach. *Fang v. United States,* 140 F.3d 1238, 1241 (9th Cir.1998). Second, if the challenged conduct does involve a degree of choice, the court must determine whether the choice involved is of the kind Congress intended to shield. *Berkovitz,* 486 U.S. at 536, 108 S.Ct. 1954. The exception applies to only those decisions grounded in considerations of social, economic or political policy. *Varig Airlines, supra,* 467 U.S. at 814, 104 S.Ct. 2755. Consequently, the primary focus of the second part of the test is on the "nature of the actions taken and on whether they are susceptible to policy analysis." *Gaubert,* 499 U.S. at 325, 111 S.Ct. 1267. Policy analysis may include the weighing of competing interests or the examination of economic constraints in light of the needs of the public. *See, Estate of Callas v. United States,* 682 F.2d 613, 620 (7th Cir.1982); *Fang, supra,* 140 F.3d at 1241–42. When multiple acts of negligence are alleged, the court must look at each alleged act of negligence and determine whether the discretionary function exception applies. *In re Glacier Bay,* 71 F.3d 1447, 1451 (9th Cir.1995).

### (i) *Decision to Entrust Timber Cutting to Lone Bear*

Plaintiffs contend the BIA was negligent when it entrusted timber cutting to Lone Bear because the BIA knew or should have known that Lone Bear (1) hired inexperienced and untrained sawyers; (2) failed to adequately train saw-

---

8. The term discretion means "the discretion of the executive or the administrator to act according to one's judgment of the best course." *Dalehite v. United States,* 346 U.S. at 34, 73 S.Ct. 956. It "includes determina-

tions made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision there is discretion." *Id.,* 346 U.S. at 35–36, 73 S.Ct. 956.

yers; (3) failed to adequately supervise its sawyers; (4) violated numerous safety standards on a regular basis; and (5) failed to have a safety program.

At the outset, the court notes that no federal statute, regulation or policy controls the BIA's decision to approve a purchaser under a contract for the sale of tribal timber. Rather, the approval of the purchaser is left to the discretion of the BIA's approving officer. Cognizant that the Blackfeet Tribe required logging activity on the Blackfeet Reservation to be conducted by tribal members, the BIA approved Lone Bear as a purchaser, at least in part, because Lone Bear employed tribal members and the Tribe's Tribal Employment Resource Office ("TERO") had previously certified Lone Bear for logging contracts.[9] Because the decision to approve Lone Bear as the purchaser involved policy considerations, *i.e.* the employment of tribal members, the decision is protected by the discretionary function exception.

### (ii) *Failure to Manage and Supervise the Safety Aspects of Lone Bear's Logging Operation*

■ Plaintiffs contend the BIA was negligent in failing to manage and supervise the safety aspects of Lone Bear's logging activities under the timber contract. Plaintiffs' argument is not persuasive because the BIA did not have a mandatory duty to manage or supervise the safety aspects of logging operations conducted pursuant to the timber contract.

No federal statute, regulation or policy imposes such a duty upon the BIA. Moreover, no such duty arises from the BIA's fiduciary duty to manage tribal forests, because the BIA's fiduciary duty flows to the Blackfeet Tribe, not to Lone Bear or Kicking Woman, and the BIA's fiduciary duty is limited in scope to preserving the tribal forests in a perpetually productive state, and ensuring the Blackfeet Tribe receives fair compensation for its timber. *See*, 25 C.F.R. § 163.3.

Paragraph B8–5 of the timber contract, set forth below, delegated safety matters to the purchaser of the timber.

**B8–5 Safety.**

The purchaser shall conduct his operations in compliance with prescribed safety practices and Federal Law. Appropriate warning signs may be required to be posted concerning hazardous conditions arising from his operations.

Although paragraph B2.6 of the timber contract states the BIA retains the authority to suspend the timber contract if the purchaser fails to comply with its terms, the retention of that authority does not mean the delegation of safety matters was not a discretionary function.[10] *See, Feyers v. United States*, 749 F.2d 1222, 1227 (6th Cir.1984) (a government decision to delegate safety responsibilities to a contractor is a discretionary function despite retention of the right to inspect and stop work). Plaintiffs have adduced no mandatory rules requiring the BIA to ensure that Lone Bear complied with the terms of the contract.

In deciding to delegate safety matters to the timber purchaser, and retain a right to suspend the purchaser's operations if it failed to comply with applicable safety laws, the BIA necessarily considered economic, social and political policies such as manpower commitments and agency expertise on safety issues. The decision to delegate safety matters to an independent contractor is routinely protected by the discretionary function exception. *See, e.g., Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660; *Layton v. United*

---

9. The TERO monitors timber sales occurring on the Blackfeet Indian Reservation to ensure the logging operations are conducted by tribal members.

10. Paragraph B2.6 provides, in pertinent part, as follows:

**2.6 Suspension of Operations.**
The Superintendent may, after written notice to the Purchaser, suspend any or all of the Purchaser's operations under the contract if the Purchaser violates any of the requirements of the contract.

*States*, 984 F.2d 1496, 1501–02 (8th Cir. 1993) (decision to delegate safety matters to a tree-cutting contractor was protected by the discretionary function exception); *accord, Richardson v. United States*, 776 F.Supp. 1373, 1376 (W.D.Ark.1991). Accordingly, it is the opinion of this court that the BIA's decision to delegate safety matters to Lone Bear was protected by the discretionary function exception.

### (iii) *Failure to Require that Lone Bear Purchase Liability Insurance or Workers Compensation Insurance*

Plaintiffs contend the Federal Acquisition Regulations ("FAR"), 48 C.F.R. §§ 28.301 *et seq.*, and the Service Contract Act of 1965, 41 U.S.C. §§ 351–358; 48 C.F.R. §§ 22.1000 *et seq.*, imposed a mandatory duty upon the BIA to require that Lone Bear purchase liability insurance and workers compensation insurance, and implement an accident prevention program.

### 1. *The Contract Service Act*

The Service Contract Act was enacted in 1965 to provide wage and safety protection to employees working under service contracts with the United States government, where the contract amount exceeds $2,500 and the contract is performed within the United States. *See*, 41 U.S.C. § 351. With respect to wages and benefits, section 351(b)(1) of Title 41 provides that employees of service contractors must be paid wages and fringe benefits that are no less than the prevailing wages and fringe benefits paid to private and public sector employees in the same locality who perform similar work. *See*, 41 U.S.C. § 351(b)(1). With respect to safety, section 351(a) of Title 41 provides that every service contract shall provide the employees of service contractors with occupational compensation insurance and accident insurance. *See*, 41 U.S.C. § 351(a)(2). Relying upon the prescriptions of § 351(a)(2), plaintiffs argue the

BIA had a mandatory duty to ensure that Lone Bear carry workers compensation coverage and liability insurance.

■ This argument is not persuasive because the Service Contract Act does not apply to the timber sale contract under scrutiny in this case. First, to fall within the scope of the Service Contract Act, the "principal purpose" of the contract must be to furnish services. *See*, 41 U.S.C. § 351. If the principal purpose of the contract is to provide something other than services, or if services are only incidental to the performance of the contract, the prescriptions of the Service Contract Act do not apply. *See*, 29 C.F.R. §§ 4.111(a), 4.131; *American Federation of Labor v. Donovan*, 757 F.2d 330, 345–46 (D.C.Cir.1985).

■ The principal purpose of the timber sale contract in this case, was the sale of timber owned by the tribe. Although the contract contained provisions requiring Lone Bear to control soil erosion and fire hazards,[11] such services were only incidental to the performance of the contract. Second, and equally compelling, the Service Contract Act applies only to contracts between a service contractor and the United States. Lone Bear and the Blackfeet Tribe were the principal parties to the timber contract. The BIA merely approved the contract as trustee of the forests located on the Blackfeet Indian Reservation.

### 2. *The Federal Acquisition Regulations*

■ The Federal Acquisition Regulations ("FAR") were established in 1983 for the purpose of codifying and publishing uniform practices and procedures for federal executive agencies to follow in making acquisitions. *See*, 48 C.F.R. § 1.101. The FAR apply to all acquisitions, as defined in part 2 of the FAR, except where expressly

---

**11.** Paragraph A15 of the timber contract required that slash be placed in a pile for burning by the BIA. Paragraph A17, part (f) required that skid trails with slopes greater than 5% were to be "waterbarred". *See*, timber contract, paras. A15, A17.

excluded. *See*, 48 C.F.R. § 1.104. An "acquisition" is defined in § 2.101 as follows:

**2.101   Definitions.**

\*\*\*

"**Acquisition** means the acquiring by contract ... of supplies or services (including construction) by and for the use of the Federal Government...."

With respect to insurance coverage, Federal Acquisition Regulation 48 C.F.R. § 28.301(b) states that all contractors providing supplies or services shall be required to provide workers compensation insurance. Section 28.307–2(a) states that all contractors providing supplies or services shall comply with applicable federal and state workers compensation requirements. Section 28.307–2(b) states that the government's contracting officer shall require the contractor to carry bodily injury liability coverage which totals at least $500,000 per occurrence. Relying upon these sections of the FAR, plaintiffs contend the BIA had a mandatory duty to require that Lone Bear carry both liability insurance and workers compensation insurance.

The FAR apply only to contracts for the acquisition of supplies and services. The timber contract at issue did not involve the acquisition of supplies, and any services received were only incidental to the contract. As discussed above, the principal purpose of the contract was the sale of timber. Accordingly, the BIA did not have a duty to require that Lone Bear carry liability insurance or workers compensation insurance.[12]

## CONCLUSION

Therefore, for the reasons set forth herein,

IT IS HEREBY ORDERED that defendant's Motion to Dismiss is GRANTED. Plaintiffs' Motion for Summary Judgment is accordingly DENIED.

12. Because the court deems it appropriate to dismiss plaintiffs' claims for the reasons described above, the court does not find it nec-essary to address the remaining arguments advanced by the government.

The Clerk of Court is directed to enter judgment accordingly.