**NOT RECOMMENDED FOR PUBLICATION**
File Name: 15a0600n.06

**No. 14-5732**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

DAVID J. WILBURN, JR., as guardian and next )
friend and on behalf of his minor adopted son, Eion )
M. Burke; as guardian and next friend and on behalf )
of his minor adopted daughter, Raegan A. Burke; as )
the duly appointed representative of the Estate of )
Tracy D. Burke; MICHAEL D. PETE, JR., as )
guardian and next friend and on behalf his minor son, )
Matthew T. Pete; KURT COMER, As the duly )
appointed representative of The Estate of Karen )
Comer, )
)
    Plaintiffs-Appellants, )
)
v. )
)
UNITED STATES OF AMERICA, )
)
    Defendant-Appellee. )

**FILED**
Aug 21, 2015
DEBORAH S. HUNT, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

OPINION

**BEFORE:**    **MERRITT, STRANCH, and DONALD, Circuit Judges.**

JANE B. STRANCH, Circuit Judge. This appeal concerns the murder of Tracy Burke and Karen Comer by Tracy's estranged husband, Brent Burke. At the time of the incident, Burke was stationed at Fort Campbell, Kentucky, where he served as a military police officer for the U.S. Army and held the rank of sergeant. Plaintiffs—the estates and immediate family members of Tracy Burke and Karen Comer—brought various survival and wrongful death claims against the United States through the Federal Tort Claims Act (FTCA), alleging that the Army breached a duty of reasonable care to the victims by failing to warn them about the danger Burke posed or take action to protect them from him. Upon finding that Plaintiffs' claims were barred by the

FTCA's intentional tort exception, the district court granted the Government's motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). We hold that Plaintiffs have stated claims under Kentucky law, and that it is not evident from the pleadings that either the FTCA's intentional tort exception or its discretionary function exception would bar these claims. Accordingly, we REVERSE the district court's dismissal and REMAND the case to the district court so that Plaintiffs may proceed with discovery.

## I. FACTUAL BACKGROUND

Burke displayed violent tendencies at least as early as 2005, while he was deployed in Egypt. There, members of his platoon observed that he was extremely upset about his relationship with his wife, Tracy: at one point he told his platoon leader, Lt. Perez, that he would kill himself, Tracy, or both if Tracy left him. Due to this and other similar statements, while Burke was in Egypt the Army twice placed him under the supervision of other soldiers and confiscated his weapons. Burke also told another soldier he had found the perfect location to murder Lt. Perez. Based on this threat, the Army removed Burke from his platoon, transferred him to mental health counseling, and ultimately returned him early to Fort Campbell, Kentucky.

At Fort Campbell, Burke continued to receive mental health treatment and prescription medications to help control his anger, depression, and other psychological disorders. In January 2006, while Burke was still taking the medication, the Army released him to active duty and deployed him to Afghanistan, where his violent behavior continued. Burke was eventually removed from his post as a detention center guard due to his repeated expressions of hatred of the detainees and an incident in which he engaged in the unauthorized use of an "O/C fogger" spray on some detainees.

Upon returning to Fort Campbell, Burke lived off-base with Tracy and their children and subsequently committed two acts of domestic violence against Tracy, both requiring police intervention. The first incident occurred on May 26, 2007, when Burke tried to physically prevent Tracy from leaving him and moving in with her former mother-in-law, Karen Comer. Local law enforcement was summoned and the incident was reported to Burke's chain of command (referred to as his "command" below). The Army investigated the situation pursuant to a written internal policy titled "Policy 7: Command Response to Incidents of Domestic Violence," which requires all Unit Commanders to respond to credible reports of domestic violence. After an investigation, the Army ordered a 72-hour cooling off period between Burke and Tracy, provided Burke with a room in the Fort Campbell barracks, and ordered Burke to attend counseling and social services sessions. His privately-owned weapons were marked as having been confiscated on the resulting report but they had not in fact been confiscated.

After the May 26 incident, Burke and Tracy physically separated and Tracy filed for divorce. Burke moved into the barracks, where Army regulations required his privately-owned weapons to be registered and stored in the unit arms room. The Army failed to inquire about Burke's weapons or determine whether they were properly registered and stored. An Army investigation report dated December 12, 2007 indicates that Burke's command could and should have controlled Burke's privately-owned weapons.

During the period of separation, Tracy told Burke's command that she feared Burke and worried about his access to his weapons. She also requested a protective order to keep Burke away from her. Around June 2007, Burke told a fellow soldier that "I'm going to shoot that bitch [Tracy]" and that he was "going to take her into the woods and shoot her." The soldier

promptly reported the threats to Burke's supervisor, who dismissed them, saying that Burke was just "blowing off steam."

On August 11, 2007, local law enforcement responded to a second domestic violence incident between Burke and Tracy. Though the Army had been notified, it did not conduct a standard investigation of the incident as required under Policy 7 and neither secured Burke's firearms nor referred him to counseling. After this second incident, Burke told another soldier that "he would be better off if his wife [Tracy] was dead." A sergeant at the base, Jonathan Dean, noted that Burke was extremely agitated and "did not need to have a weapon in his possession in the condition he was in." Sgt. Dean reportedly took Burke's privately-owned 9mm pistol away from him out of concern for Tracy's well-being and because he knew it was against Army regulations for Burke to store the unregistered weapon at his residence or in his vehicle.

On Friday August 31, 2007, Burke asked Sgt. Dean to return his pistol for recreational use, and Sgt. Dean arranged for its return several days later. On September 11, 2007, ten days after Burke's pistol was returned to him, he drove about two hours to Comer's home, where Tracy was living at the time, and used the weapon to murder both Tracy and Comer. Burke was tried in military court and a seven-person panel found him guilty of the murders.

## II. ANALYSIS

### A. The 12(b)(1) and 12(b)(6) Standards

We review de novo the district court's dismissal of an action for lack of subject matter jurisdiction under Federal Rule of Civil Procedure Rule 12(b)(1) and for failure to state a claim upon which relief can be granted under Rule 12(b)(6). When a defendant challenges subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1), the plaintiff must meet the burden of proving jurisdiction. *Golden v. Gorno Bros., Inc.,* 410 F.3d 879, 881 (6th Cir. 2005).

Here, the Government's motion to dismiss was a facial attack on the complaint—it did not contest the veracity of Plaintiffs' allegations. If a motion attacks the face of the complaint, the plaintiff's burden "is not onerous." *Musson Theatrical, Inc. v. Federal Express Corp.,* 89 F.3d 1244, 1248 (6th Cir.1996). The plaintiff need only demonstrate that the complaint alleges a "substantial" federal claim, meaning that prior decisions do not inescapably render the claim frivolous. *Id.* A court evaluating a facial attack must consider the allegations of fact in the complaint to be true. *Gentek Bldg. Prods., Inc. v. Sherwin-Williams Co.,* 491 F.3d 320, 330 (6th Cir. 2007). Thus, "the plaintiff can survive the motion by showing any arguable basis in law for the claim made." *Musson Theatrical,* 89 F.3d at 1248.

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). Under Rule 8(a)(2) of the Federal Rules of Civil Procedure, a complaint must provide a short and plain statement of the claim showing that the pleader is entitled to relief in order to give the defendant fair notice of what the claim is and the grounds upon which it rests. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). This notice pleading standard does not require "detailed" factual allegations, but it does require more than the bare assertion of legal conclusions. *Id.* To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009).

## B. The Federal Tort Claims Act (FTCA)

The FTCA waives the federal government's sovereign immunity in limited contexts, and "is the exclusive remedy for suits against the United States or its agencies sounding in tort." *Himes v. United States*, 645 F.3d 771, 776 (6th Cir. 2011) (citing 28 U.S.C. § 2679(a)). Under the FTCA, federal district courts have jurisdiction over claims against the United States for personal injury or death caused by the "negligent or wrongful act or omission" of any government employee acting within the scope of his employment, "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred," 28 U.S.C. § 1346(b)(1)—Kentucky law, in this case.

The FTCA excludes several types of claims from its waiver of sovereign immunity. 28 U.S.C. § 2680. If a case falls within one of these statutory exceptions, the court lacks subject matter jurisdiction over it. *Feyers v. United States*, 749 F.2d 1222, 1225 (6th Cir. 1984). The Government argues that two distinct exceptions apply here, the intentional tort exception and the discretionary function exception. We first consider the viability of Plaintiffs' claims under Kentucky law, then address each of the two exceptions.

## C. Application of Kentucky Tort Law

Over the course of this litigation, Plaintiffs have advanced three distinct theories supporting the origin of the duty of reasonable care that the Army purportedly owed Tracy and Comer under Kentucky law: (1) that the Army voluntarily assumed a duty to Tracy; (2) that a statutory duty governing mental health professionals applies; and (3) that a duty arose out of a special relationship between Tracy and the Army. We discuss each of the three in turn.

1. The Army's voluntary assumption of a duty

Plaintiffs argue that the Government voluntarily assumed a duty to Tracy and Comer by undertaking to protect members of the military community in three ways: through the passage and implementation of Policy 7 and other regulations concerning firearms on base; through Tracy's interactions with Burke's command; and through Sgt. Dean's confiscation of Burke's pistol. When determining whether a defendant has voluntarily assumed a duty to a plaintiff, Kentucky courts apply § 323 of the Restatement (Second) of the Law of Torts. *Horn v. Horn*, 630 S.W.2d 70, 73 (Ky. 1982) (Stephenson, J., dissenting); *Murphy v. Second St. Corp.*, 48 S.W.3d 571, 575 n.16 (Ky. Ct. App. 2001). Section 323 provides that:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Restatement (Second) of Torts § 323 (1965).[1]

When considering whether a defendant "increased the risk" of harm to the plaintiff under § 323(a), the pertinent question is not whether the risk was increased by the defendant's failure to adhere to an internal policy compared to what the risk would have been had it adhered to the policy. Rather, the correct question is whether the defendant's adoption of and subsequent failure to adhere to the policy increased the risk of harm to the plaintiff over the risk the plaintiff would have faced had the policy never been adopted at all. Restatement (Second) of Torts § 323,

---

[1]Rather than citing Restatement § 323, Plaintiffs reference Restatement § 324A, which governs voluntarily-assumed duties to third parties. At argument the Government noted that § 323 is more applicable because Plaintiffs are asserting a duty that flows directly from the Army to Tracy, not through Burke. We agree. This does not alter our analysis, however, as the pertinent requirements of both are identical: subsections (a) and (b) of § 323 correspond exactly to subsections (a) and (c) of § 324A, and subsection (b) of § 324A has no application here.

cmt. c; *see also Morgan v. Scott*, 291 S.W.3d 622, 632-33 (Ky. 2009). Here, Plaintiffs argue that the Army assumed a duty to Tracy because Tracy relied upon Policy 7 and Burke's command to protect her.

Policy 7 contains a "Domestic Violence Checklist," which lists the "minimum actions required of Commanders" in domestic violence situations. The checklist's protective measures "are designed to safeguard members of the military community while the case is assessed by Social Work Services and investigated by the Fort Campbell Police." It directs Unit Commanders to, among other things, "Order the soldier to move into the barracks for a minimum of seventy-two (72) hours," "Order the soldier to immediately turn in all privately owned firearms to the unit arms room," and "Contact the Family Advocacy Victim Advocate Program . . . to ensure the victim is aware of the programs and policies that provide support and protection." Unit Commanders are further directed to "issue a Military Protective Order [MPO] . . . to safeguard victims, quell disturbances, and maintain good order and discipline providing victims time to pursue protective orders through civilian courts, or to support existing civilian orders of protection." Unit Commanders must then "[r]eassess the situation at the end of the forty-eight hour period, and determine if the above restrictions should be modified, or canceled."

Here, Plaintiffs note that "it is reasonable to infer that Tracy relied upon" the Army's inquiry into the location of Burke's privately owned weapons "because Policy 7 expressly requires that the Domestic Violence Checklist be forwarded to the victim." Furthermore, their complaint alleges that after the May 26 incident, Tracy informed Burke's command that she feared Burke and his access to his weapons, and that she requested a protective order to keep Burke away from her. At oral argument, Plaintiffs represented that Tracy had multiple

conversations with members of Burke's command about her fear of Burke during the summer leading up to her murder.

Plaintiffs also note that when Burke moved into the barracks during the separation from Tracey, Fort Campbell Regulation 190-1 and Army Regulation 190-11 required that his privately-owned weapons be registered and stored in the unit arms room, and point out that Sgt. Dean took Burke's pistol from him of Dean's own volition, then returned it to Burke a week before the murders.

Each bare fact—that the Army did not follow its own regulations, that Sgt. Dean took and then returned Burke's gun, or that Tracy told Burke's command that she feared Burke—is not sufficient to show that the Army assumed a duty to warn or protect her. Tracy must also show that the army took some action *upon which she relied*. Here, Plaintiffs have asserted that Tracy discussed her fear of Burke with Burke's command multiple times in the months leading up to her murder, and that Policy 7 requires that a Military Protective Order be implemented and forwarded to Tracy. It is plausible that representations Burke's commanding officer made in those conversations or actions mandated in an MPO caused Tracy to reasonably rely on Burke's command to enforce its rules and protect her. We therefore conclude that she has stated a claim under Kentucky law based on a reliance theory.

At the summary judgment stage, Plaintiffs will have to present evidence sufficient to enable a reasonable trier of fact to conclude that Tracy reasonably relied on some action taken by the Army. But it would be premature to dismiss the complaint without first affording Plaintiffs the opportunity to take discovery to explore what was said to Tracy during her interactions with Burke's command and whether she was given a basis to believe that Policy 7, a Military

Protective Order, the confiscation of Burke's weapon, or some other action would be implemented by the Army to provide for her protection.

2. Mental health professionals' duty under Kentucky Revised Statute (KRS) § 202A.400

Plaintiffs' complaint asserts that the Government had a duty to warn Tracy and Comer under the Kentucky statute codifying a mental health care providers' duty to warn potential victims of their patients. The duty is created once "the patient has communicated to the mental health professional an actual threat of physical violence against a clearly identified or reasonably identifiable victim." Ky. Rev. Stat. § 202A.400(1),(2). The statute defines a "mental health professional" to include psychiatrists and physicians engaged in mental health services, registered nurses, and various other professional therapists and counselors. *Id.* § 202A.400(4).

The district court noted that the amended complaint alleges that Burke communicated threats to his fellow officers and those in his chain of command as opposed to mental health professionals. In their response to the Government's motion to dismiss, Plaintiffs argued that without the benefit of discovery, they could not determine whether Burke communicated a threat to the Army's medical officers. The district court, however, found this unconvincing because paragraph 31 of Plaintiffs' complaint alleged that there was "no indication that the Army took any steps to assess, counsel or treat Burke's long history of psychological disorders[.]" The complaint, however, places this allegation in a fuller context: that sentence continues with "—which include depression, anger management issues, and explosive personality disorder—when he was referred to counseling following the May 26, 2007 incident." And the preceding paragraph in the complaint states that "the Army ordered Burke to attend counseling and social services." Read in the light most favorable to Plaintiffs, these paragraphs allege that though Burke was ordered to attend counseling, there is no sign that he was treated for his longstanding

psychological disorders during those sessions. Given that Burke repeatedly made statements about killing Tracy to various members of the military community, Plaintiffs' assertions concerning Burke's interactions with mental health professionals are at least plausible. Accordingly, we find that it is appropriate for Plaintiffs to have the opportunity to conduct discovery on the issue.

3. A tort duty arising from a special relationship between the Army and Tracy

Plaintiffs also argue that simply by implementing Policy 7 the Army created a special relationship with Tracy and thereby assumed an ongoing duty to warn Tracy about Burke's comments and ensure that Burke's weapons were secured.

A Kentucky Supreme Court case surveying the state of the law pertaining to duties to prevent harm directly caused by a third party notes that "[a]s a general rule" under Kentucky law, "an actor whose conduct has not created a risk of harm has no duty to control the conduct of a third person to prevent him from causing harm to another." *Grand Aerie Fraternal Order of Eagles v. Carneyhan*, 169 S.W.3d 840, 849 (Ky. 2005). A duty to exercise "reasonable care to prevent harm by controlling a third person's conduct" can, however, arise where: "(a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or (b) a special relation exists between the actor and the other which gives rise to a right of protection." *Id.* at 849 (quoting Restatement (Second) of Torts § 315)). Though Plaintiffs assert that a special relationship existed between Tracy and the Army, they fail to explain how Kentucky law makes this so.

*Grand Aerie* mentions that courts outside of Kentucky have found special relationships rooted in the defendant's failure to warn potential victims of impending harm in certain situations, but the examples it provides point only to state/parolee and psychotherapist/patient

relationships. *Grand Aerie*, 169 S.W.3d at 851-52. Plaintiffs have provided no legal support indicating that the Kentucky Supreme Court would hold that such a duty would apply in the instant case outside the context of Burke making a statement to a mental health professional. Such statements are covered by statute in Kentucky as discussed above, and are unrelated to Policy 7 or the confiscation of Burke's firearm.

*Grand Aerie* further acknowledged that the Second and Third Restatements of Torts have found a special relationship to exist between master and servant that could give rise to a duty of reasonable care based on the exercise of control—such a duty arising only if "the servant is using an instrumentality of the employment relationship to cause the harm" (Second Restatement) or "the employment facilitates the employee's causing harm to third parties" (Third Restatement). 169 S.W.3d at 852. Because Burke committed the tort outside of the employment relationship and without the assistance of the Army's equipment or facilitation, finding that the Army had a duty to control him based on the employment relationship would require an expansion of the principles of *Grand Aerie*.

Plaintiffs have not made a legal argument that such an expansion is appropriate, or that the Kentucky Supreme Court would extend the law in that manner if presented with the issue. Plaintiffs have also failed to provide any other legal support for the concept that the mere existence or implementation of Policy 7 or the cited regulations created a special relationship with Tracy that would require it to warn or protect her absent the additional requirements voiced in Restatement § 323, discussed above. Accordingly, we conclude that the plaintiffs have not sufficiently demonstrated that the Army had any duty to Tracy independent of the requirements of Restatement § 323 or the obligations of a mental health professional duty expressed in KRS § 202A.400.

**D. The Intentional Tort Exception**

The district court held that the intentional tort exception barred Plaintiffs' claims because they "have not alleged that the United States had a duty to warn or protect Tracy that is independent from its employment relationship with Burke." The intentional tort exception does bar a claim that the Army failed to adequately supervise or control Burke by not fully implementing Policy 7. But it provides no basis to dismiss Plaintiffs' claims that the Army assumed a duty to Tracy under Restatement § 323 by inducing reliance in her, or through the mental health care provider duty in KRS § 202A.400. Those potential sources of the Army's duty are independent of negligent supervision and failure to control, and are independent of Burke's employment relationship with the Army. They therefore stand outside the intentional tort exception.

Under the FTCA's intentional tort exception, the United States retains sovereign immunity for claims "arising out of" assault, battery, or several other specified intentional torts. 28 U.S.C. § 2680(h). Courts have interpreted "arising out of" broadly. In 1985, the Supreme Court decided a case in which an Army private had been kidnapped and murdered by another soldier. *United States v. Shearer*, 473 U.S. 52 (1985). The *Shearer* plaintiff—the murdered soldier's mother—argued that the Army's negligent supervision of and failure to control the perpetrator had caused her son's death. *Id.* at 53-54. The Court applied the *Feres* doctrine[2] and ruled against the mother, but four justices further found that the mother's case would be barred

---

[2]In *Feres*, the Supreme Court held that "a soldier may not recover under the Federal Tort Claims Act for injuries which 'arise out of or are in the course of activity incident to service.'" *Shearer*, 473 U.S. at 57 (quoting *Feres v. United States*, 340 U.S. 135, 146 (1950)). *Feres* does not apply in the instant case because here the victims were civilians.

under the FTCA's intentional tort exception because the suit arose from the intentional act of

murder. Chief Justice Burger, writing for the plurality, explained:

> Respondent cannot avoid the reach of § 2680(h) by framing her complaint in
> terms of negligent failure to prevent the assault and battery. Section 2680(h) does
> not merely bar claims *for* assault or battery; in sweeping language it excludes any
> claim *arising out of* assault or battery. We read this provision to cover claims like
> respondent's that sound in negligence but stem from a battery committed by a
> Government employee. Thus the express words of the statute bar respondent's
> claim against the government.

*Shearer*, 473 U.S. at 55 (plurality opinion) (emphasis in the original) (internal quotation marks

removed). We later adopted the *Shearer* plurality's reasoning in an opinion holding that the

intentional tort exception barred a mother's claim that the Army negligently supervised

servicemen who beat her son, also a soldier, to death while they were on leave together.

*Satterfield v. United States*, 788 F.2d 395, 399-400 (6th Cir. 1986).

Several years after *Shearer*, however, the Supreme Court held that the intentional tort

exception does not categorically ban all claims alleging negligence against government

employees who permit a foreseeable battery to occur. *Sheridan v. United States*, 487 U.S. 392,

403 (1988). The *Sheridan* plaintiffs filed suit under the FTCA after an armed, drunken, off-duty

serviceman named Carr fired several shots into their vehicle, causing injuries and property

damage. *Id.* at 395. They alleged that three naval corpsmen working in Bethesda Naval Hospital

had observed Carr—also a naval corpsman—on the hospital premises and saw that he was both

drunk and armed, yet they neither prevented him from leaving nor reported him to the

authorities, *id.* at 395, as required by Navy regulations, *id.* at 401 n.5.

The lower courts held that the intentional tort exception barred the plaintiffs' claims

because the government's liability arose out of an intentional tort committed by a government

employee. The Supreme Court reversed. The Court started by assuming, as had the courts

below, that the plaintiffs' allegations would support a negligence claim under Maryland tort law's "good Samaritan provision."[3] *Sheridan*, 487 U.S. at 401. It then held that the "arising out of" language in the FTCA's intentional tort exception does not reach claims that rest on a theory of liability "entirely independent of" the intentional tortfeasor's status as a government employee. *Id.* The holding emphasized the disconnect between Carr's employment status and the conduct of the allegedly-negligent servicemen who allowed him to roam the hospital grounds while drunk and armed:

> [T]he negligence of other Government employees who allowed a foreseeable assault and battery to occur may furnish a basis for Government liability that is entirely independent of Carr's employment status . . . [I]t seems perfectly clear that the mere fact that Carr happened to be an off-duty federal employee should not provide a basis for protecting the Government from liability that would attach if Carr had been an unemployed civilian patient or visitor in the hospital. Indeed, in a case in which the employment status of the assailant has nothing to do with the basis for imposing liability on the Government, it would seem perverse to exonerate the Government because of the happenstance that Carr was on a federal payroll.
>
> In a case of this kind, the fact that Carr's behavior is characterized as an intentional assault rather than a negligent act is also quite irrelevant. If the Government has a duty to prevent a foreseeably dangerous individual from wandering about unattended, it would be odd to assume that Congress intended a breach of that duty to give rise to liability when the dangerous human instrument was merely negligent but not when he or she was malicious. In fact, the human characteristics of the dangerous instrument are also beside the point. For the theory of liability in this case is analogous to cases in which a person assumes control of a vicious animal, or perhaps an explosive device. *Cf. Palsgraf v. Long Island R. Co.,* 248 N.Y. 339, 162 N.E. 99 (1928). Because neither Carr's employment status nor his state of mind has any bearing on the basis for

---

[3]On appeal of summary judgment following the Supreme Court's remand, the Fourth Circuit considered whether the Navy's promulgation of the base regulations at issue indicated that it had voluntarily assumed a duty under Maryland's "Good Samaritan" theory of liability. *Sheridan v. United States*, 969 F.2d 72, 74 (4th Cir. 1992). The court concluded that it did not because "[t]here is simply no evidence that the actions of the government in promulgating and carrying out, or failing to carry out, the regulations increased the risk of harm to the plaintiffs or induced reliance in the plaintiffs, prerequisites to the imposition of liability under a Maryland 'Good Samaritan' theory." *Id.* Restatement § 323 imposes the same conditions and leads to the same conclusion here: absent a showing of resulting increased risk of harm or reliance, simply promulgating or being subject to the regulations does not create the assumption of a tort duty under Kentucky law.

petitioners' claim for money damages, the intentional tort exception to the FTCA is not applicable in this case.

*Sheridan v. United States*, 487 U.S. at 401-03.

After *Sheridan*, then, it is clear that the intentional tort exception does not apply to liability that is independent of the intentional tortfeasor's status as a government employee. Numerous subsequent district and appellate court decisions have held that the intentional tort exception does not apply where the United States breached a duty independent of its duty to supervise the tortfeasor who perpetrated the assault and battery. *See, e.g., Mackay v. United States*, 247 F. App'x 641, 645 (6th Cir. 2007); *Cline v. United States*, 13 F. Supp. 3d 868, 873-74 (M.D. Tenn. 2014) (collecting cases).

Though *Sheridan* expressly declined to decide whether negligent training or negligent supervision claims can ever survive the intentional tort exception, *id.* at 403 n.8, our precedent in *Satterfield* establishes that the exception bars such claims here. *See Estate of Smith v. United States*, 509 F. App'x 436, 437, 442-43 (6th Cir. 2012). Accordingly, in the instant case, the intentional tort doctrine blocks claims based on a duty owed to Tracy that simply amounted to a negligent supervision or training of Burke, but does not block claims based on a duty owed to Tracy that was independent of Burke's employment status as a government employee at the time of the murders.

Evidence of assurance from Burke's command that the Army would restrict Burke to the base, secure all of his weapons, or take some other action that Tracy reasonably relied on would create a duty to her under Kentucky law. *See Morgan*, 291 S.W.3d at 632-33. This duty is not subject to the intentional tort exception because it arises from a direct relationship that the Army established with Tracy independent of Burke's employment relationship.

As was the case in *Sheridan*, the fact that the Army caused Tracy to rely on it to lessen her risk of an intentional tort rather than an act of negligence would be irrelevant. Had Tracy reasonably relied on the Army's assertion that it would protect her from a non-employee, a vicious animal, or a non-human hazard, the intentional tort exception would not apply. Following *Sheridan's* logic, there would be no basis to conclude that the exception would apply simply because Burke happened to be an employee. Based on Plaintiffs' allegations, the duty flows under Restatement § 323 simply because the Army took on an affirmative duty to Tracy— the assertion that it would mitigate a risk to her—upon which she reasonably relied. This is not a negligent supervision claim, nor is it based on the Army's employment relationship with Burke. The fact that Burke was employed by the Army would also not be of any consequence with respect to the mental health professional's duty to disclose under Kentucky law: the mental health professional would have a duty to warn about a patient's threat regardless of whether the patient was a soldier or civilian. Thus, in the narrow confines of the two claims presented, the intentional tort exception does not apply.

**E. The Discretionary Function Exception**

The discretionary function exception states that the FTCA's waiver of sovereign immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Claims that fall within this exception are not within our subject matter jurisdiction and must be dismissed. *See Kohl v. United States*, 699 F.3d 935, 940 (6th Cir. 2012).

To determine whether a claim falls within the discretionary function exception, courts apply a two-part test. *United States v. Gaubert*, 499 U.S. 315, 322-23 (1991). Step one "requires

a determination of whether the challenged act or omission violated a mandatory regulation or policy that allowed no judgment or choice." *Rosebush v. United States*, 119 F.3d 438, 441 (6th Cir. 1997) (citing *Gaubert,* 499 U.S. at 322-23). If there was such a violation, then the discretionary-function exception will not apply, because "there was no element of judgment or choice," *id.*, and thus "the employee has no rightful option but to adhere to the directive." *Berkovitz v. United States,* 486 U.S. 531, 536 (1988).

But if, on the other hand, there was room for judgment or choice in the decision made, then the challenged conduct was discretionary. *See Rosebush,* 119 F.3d at 441. In that case, step two of the *Gaubert* test requires a court to evaluate "whether the conduct is 'of the kind that the discretionary function exception was designed to shield'" from liability. *Id.* (quoting *Gaubert,* 499 U.S. at 322-23). This element of the test is meant "to prevent judicial 'second-guessing' of . . . administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines),* 467 U.S. 797, 814 (1984).

Here, we conclude that any liability of the Government resulting from KRS § 202A.400 would not be subject to the discretionary function exception because there is no discretionary choice to be made in compliance with that statute: if a patient communicates to a mental health professional "an actual threat of violence" against a "clearly identified" victim, the mental health professional incurs a duty to warn that is only discharged once "reasonable efforts are made to communicate the threat to the victim, and to notify the police department closest to the patient's and the victim's residence of the threat of violence." Ky. Rev. Stat. § 202A.400(1),(2). Likewise, Army Regulation 190-11 is mandatory:

> Commanders will ensure privately-owned arms and ammunition . . . are protected on their installations and facilities. Commanders will . . . [s]ecure arms and

ammunition belonging to Soldiers living on the installation in the installation armory or unit arms room in approved locked containers . . .

A.R. 190-11 4–5.  A duty under Kentucky law rooted in either AR 190-11 or KRS §202A.400 would therefore not meet the first step of the discretionary function exception, as neither affords those implementing the rules any choice but to follow them.

Policy 7, on the other hand, becomes discretionary after 48 hours, as it requires commanders to "[r]eassess the situation" at that time to "determine if the above restrictions should be modified, or cancelled."  And implementation of Policy 7 after those first 48 hours involves sufficient policy considerations to satisfy step two of the *Gaubert* test.  *See Rosebush*, 119 F.3d at 443.  We are less convinced, however, that a claim based on a direct representation from the Army to Tracy that induced reliance in Tracy would entail judicial second guessing of an "administrative decision[] grounded in social, economic, and political policy," *Varig Airlines,* 467 U.S. at 814, such that it would invoke the discretionary function exception.

The government's management of its resources and response to threats invokes policy concerns about soldiers' privacy, discipline, and the safety of the military community.  But a direct representation by the government to a domestic violence victim that it will take certain action, followed by a failure to take that action, is not subject to the same policy analysis.  An initial decision by a member of Burke's command about whether or not to make a representation that would reasonably induce Tracy's reliance is both discretionary and subject to policy analysis.  But the decision to follow through once reliance has been induced is not subject to the same policy analysis.  Similarly, while the allocation of resources and decisions of what to include in a Military Protective Order are often discretionary functions, the execution of the MPO once drafted is usually not: typically, its language is mandatory.  We conclude that the discretionary function exception does not bar Plaintiffs' claims here at the pleading stage.

## **III. CONCLUSION**

For the reasons stated above, we REVERSE the district court's dismissal of this case and

REMAND the case to the district court for further proceedings in accordance with this opinion.