David Alan Ezra, Senior United States Distict Judge
Before the Court is Defendant United States of America's ("Defendant" or "the United States") Motion for Summary Judgment filed on June 15, 2018. (Dkt. # 24.) Karin Kristensen, Individually and as Administratix of the Estate of Dawn Larson Giff, Donald Larson, Cierra Larson, as Guardian and Next Friend of K.L., a minor, Michael Farina, Individually and as Personal Representative of the Estate of Lydia Farina, and as Next Friend of J.W.F., E.F., M.F., & K.F., all minor children, Beverly Merrick, Christina Guzman, Individually and as Personal Representative of the Estate of Steven Guzman, as Guardian and Next Friend of M.G., a minor, and Marina Lynn Ellis (collectively, *463 "Plaintiffs") filed their Response on June 29, 2018. On July 6, 2018, the United States filed its Reply, (Dkt. # 29), and on August 10, 2018, Plaintiffs filed their Sur-Reply (Dkt. # 34).
Pursuant to Local Rule CV-7(h) the Court[1] finds this matter suitable for disposition without a hearing. After careful consideration of the memoranda and exhibits filed in support of and in opposition to the motion, the Court, for the reasons that follow-DENIES Defendant's Motion for Summary Judgment.
BACKGROUND
This case stems from the tragic shooting of Dawn Larson Giffa, Lydia Farina, Michael Farina, Steven Guzman, and Christina Guzman in Killeen, Texas, by Dawn Larson Giffa's husband, Specialist ("SPC") Atase Giffa, an active duty Army soldier stationed at Fort Hood, Texas. (Dkt. # 15 at 4-5, 12-14.)[2]
On the evening of February 9, 2015, neighbors witnessed a physical altercation between SPC Giffa and Dawn Larson Giffa outside their off-base home at 1710 Godman Street, Killeen, Texas. (Id. at 5.) The incident took place after SPC Giffa took Dawn Larson Giffa's and her son K.L.'s identification documents and Dawn Larson Giffa's credit cards and money. (Id. ) Dawn Larson Giffa went to the home of her neighbors, Michael and Lydia Farina, and called the Killeen Police Department ("KPD"). (Id. ) KPD officers responded, but declined to arrest SPC Giffa based on his military status.[3] (Id. at 5-6.) Instead, they instructed Dawn Larson Giffa to call the military police at Fort Hood and SPC Giffa's military commander. (Id. )
On February 10, 2015, Dawn Larson Giffa went to Fort Hood to speak with her husband's commanding officer. (Id. at 8.) She reported the incident and was provided with a contact number for SPC Giffa's commander. (Id. ) She returned to the Farina home and called SPC Giffa's commander at Fort Hood. (Id. ) After completing the call, she told Michael and Lydia Farina that Army personnel were going to come get SPC Giffa, put him on a 48-hour watch, require him to live out of the barracks at Fort Hood for seven days, and issue a 500-foot no-contact order. (Id. )
On February 12, 2015, Dawn Larson Giffa again called the commander from the Farina's home and was again told of the 48-hour watch, seven days in the barracks, and 500-foot no-contact order. (Id. at 9.) During the conversation, she informed the commander that SPC Giffa had taken her driver's license, credit cards, and her and her son's Legal Permanent Resident identification cards ("Green Cards").[4] After receiving this information, uniformed army personnel went in and out of the Giffa residence multiple times, sometimes in the presence of SPC Giffa, sometimes not, to search for the documents. (Id. at 10.)
On February 14, 2015, Dawn Larson Giffa and Michael and Lydia Farina observed SPC Giffa driving less than 500 feet from their residence in violation of the no-contact *464 order. (Id. ) Dawn Larson Giffa called SPC Giffa's commander to report the violation. (Id. at 10.) It is not clear from the record before the Court whether any action was taken in response. At some point on either February 16 or February 17, 2015, Dawn Larson Giffa and SPC Giffa attended a family counseling session with an Army Counselor on base. (Id. at 11.) After the session, Dawn Larson Giffa told the Farina's that she had told the Army Counselor that if SPC was released he would kill her. (Id. )
On February 18, 2015, SPC Giffa was released from Fort Hood to return to the Giffa home. (Id. at 12.) He purchased a gun from a pawn shop in Temple, Texas, and ammunition from Walmart. (Id. ) Dawn Larson Giffa and her son, K.L., remained at the Farina home. (Id. ) On February 22, 2015, SPC Giffa went to the Farina home to ask Dawn to return. (Id. ) When she refused, he left, retrieved his firearm, and returned to the Farina home where he opened fire. (Id. at 12-13.) He shot and injured Michael Farina, and shot and killed Lydia Farina. (Id. at 13.) He then dragged Dawn Larson Giffa from the Farina house. (Id. ) Another set of neighbors, Christina and Steven Guzman, relatives of the Farinas, heard the commotion and attempted to help Dawn. (Id. ) SPC Giffa shot and injured Christina Guzman and shot and killed Steven Guzman. (Id. at 13-14.) He then shot and killed Dawn Larson Giffa before killing himself via self-inflicted gunshot wound. (Id. at 14.)
On February 20, 2017, the survivors, the individuals representing the estates of those killed, and individuals representing the children of those killed filed suit pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b)(1), 2671, et seq , for the Army's negligent undertaking of its duty to protect Dawn Larson Giffa and her neighbors in violation of Army and Department of Defense regulations. (Id. at 19-29.)
LEGAL STANDARD
"Summary judgment is appropriate when, viewing the evidence and all justifiable inferences in the light most favorable to the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." Bridgmon v. Array Sys. Corp., 325 F.3d 572, 576 (5th Cir. 2003) ; Fed. R. Civ. P. 56(a) ; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The main purpose of summary judgment is to dispose of factually unsupported claims and defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the initial burden of demonstrating the absence of any genuine issue of material fact. Id. at 323, 106 S.Ct. 2548. If the moving party meets this burden, the non-moving party must come forward with specific facts that establish the existence of a genuine issue for trial. ACE Am. Ins. Co. v. Freeport Welding & Fabricating, Inc., 699 F.3d 832, 839 (5th Cir. 2012). In deciding whether a fact issue exists, the Court "may not make credibility determinations or weigh the evidence." Tiblier v. Dlabal, 743 F.3d 1004, 1007 (5th Cir. 2014) (quoting Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) ). However, "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." Brown v. City of Hous., 337 F.3d 539, 541 (5th Cir. 2003). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Hillman v. Loga, 697 F.3d 299, 302 (5th Cir. 2012) (quoting *465 Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) ).
DISCUSSION
The United States argues that: (1) Plaintiffs' claims are barred by the intentional tort exception to the FTCA because there is no evidence creating a genuine dispute that the United States had any duty to protect any of the Plaintiffs outside of its employment relationship with SPC Giffa; and (2) even if a cause of action could be maintained under the FTCA for negligent undertaking under these circumstances, Texas law bars recovery because a private employer could not be held liable for negligent undertaking on these facts. (Dkt. # 24 at 3.) The Court will consider both of these arguments in turn, reiterating that for the purposes of a summary judgment motion, the Court may not make credibility determinations, nor may it weigh the evidence. Tiblier, 743 F.3d at 1007.
I. The Intentional Tort Exception to the FTCA
The FTCA grants federal district courts jurisdiction over claims against the United States for money damages "for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).[5] That grant of jurisdiction, a waiver of sovereign immunity, does not include "any claim arising out of" a variety of intentional torts, including assault and battery. 28 U.S.C. § 2680(h).
The threshold question in an FTCA case based on negligence but predicated on the occurrence of an intentional tort is, therefore, whether the negligence alleged on behalf of the United States impermissibly "arises out of" the intentional tort. Here, the question is whether the alleged negligence by the Army "arises out of" the assault and battery committed by SPC Giffa, barring Plaintiffs' claims, or whether the Army's negligent undertaking was distinct from SPC Giffa's actions such that a genuine factual dispute exists and summary judgment is inappropriate.
The Supreme Court considered the words "any claim arising out of" with respect to assault and battery pursuant to a claim under the FTCA in Shearer v. United States and Sheridan v. United States. In Shearer, a private in the Army was kidnapped and murdered by another servicemen. 473 U.S. 52, 53, 105 S.Ct. 3039, 87 L.Ed.2d 38 (1985). His mother sued the Army under the FTCA for negligently failing to prevent Shearer's death, on the grounds that they had known that the serviceman who committed the murder had already been convicted of manslaughter while serving on an Army base in Germany. Id. at 54, 105 S.Ct. 3039.
A plurality of the Supreme Court held that the intentional tort exception to the FTCA barred the claim, because the exception bars not only claims for battery, but also claims "that sound in negligence but stem from a battery committed by a Government employee." Id. at 55, 105 S.Ct. 3039. The plurality went on to note that the public policy rationale behind a broad *466 understanding of the intentional tort exception in the case was that the suit required a civilian court to impermissibly second-guess military decisions because the allegations involved respondeat superior, alleging that "superiors in the Army negligently and carelessly failed to exert a reasonably sufficient control over [the murderer]." Id. at 58, 105 S.Ct. 3039 (internal quotation marks omitted.) The plurality did not rule on claims independent of that respondeat superior context.
In Sheridan, decided three years later, an employee of a naval medical hospital became very inebriated and was found by three navy corpsmen on hospital property in that state. 487 U.S. 392, 395, 108 S.Ct. 2449, 101 L.Ed.2d 352 (1988). When it became apparent that he had a gun in his possession, the corpsmen left, took no further action to subdue him, and failed to alert any appropriate authorities in spite of Navy policies barring firearms in Navy facilities. Id. Later in the evening, the employee caused damage to a car and physical injury to a bystander when he fired the weapon. Id.
The Court qualified its holding in Shearer, noting that the intentional torts exception is not a complete bar to liability just because an intentional tort has been committed: "it is both well settled and undisputed that in at least some situations the fact that an injury was directly caused by an assault or battery will not preclude liability against the Government for negligently allowing the assault to occur." Id. at 398-99, 108 S.Ct. 2449 (citing United States v. Muniz, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963) (upholding a claim under the FTCA by a prisoner against prison officials who were negligent in failing to prevent the assault that caused his injury)).
The Court held that the negligence claim against Government employees was not barred because the basis for liability "[wa]s entirely independent of [the intentional tortfeasor's] employment status." Id. at 401, 108 S.Ct. 2449. The Navy's voluntary adoption of regulations that prohibited the possession of firearms on the naval base and that required all personnel to report the presence of any such firearm was such an independent basis, because the liability was based on the negligence of the naval corpsmen who had failed to report the tortfeasor, rather than based on the tortfeasor's status as a government employee. Id. at 401-02, 108 S.Ct. 2449.
The leading case in this Circuit interpreting Shearer and Sheridan is Leleux v. United States. In Leleux, the petitioner filed a claim under the FTCA to recover damages for being unknowingly infected with a sexually transmitted disease through a relationship with a Navy recruiter. 178 F.3d 750, 753 (5th Cir. 1999). The Fifth Circuit affirmed the grant of United States' motion to dismiss, holding that while the contraction of a veneral disease was a battery, there was no negligent act "separate and apart" from the battery to provide a cause of action under the FTCA. Id. at 755.
In holding that Leleux had not stated a viable claim under the FTCA, the panel noted that " Sheridan stands for the principle that negligence claims related to a Government employee's ... intentional tort may proceed where the negligence arises out of an independent, antecedent duty unrelated to the employment relationship between the tortfeasor and the United States." Id. at 757. Leleux, the panel determined, had failed to establish such a duty by failing to reference any "regulation or duty assumed by the Navy that concerns the Navy's responsibility for the welfare of third parties." Id. at 758.
More recently, in Bodin v. Vagshenian, a case in which a Veterans Administration *467 ("VA") doctor at a VA hospital sexually assaulted patients, the Fifth Circuit analyzed a variety of federal cases with similar facts from other Circuits before deciding that the plaintiffs' claims under the FTCA made out a viable claim for negligence that was not barred by the intentional torts exception. 462 F.3d 481, 488-91 (5th Cir. 2006).
The facts of the case at bar are not precisely analogous with any of this Circuit's precedent. The United States urges the Court to apply Leleux and find that any alleged negligence by the Army "is not sufficiently distinct from the underlying assault and battery." (Dkt. # 24 at 6.) It explains:
Plaintiffs do not allege the United States had any duty to protect them independent of its employment relationship with SPC Giffa; furthermore, they allege no regulation or duty assumed by the United States that concerns a responsibility to protect the general public from the type of harm caused by SPC Giffa ... Plaintiffs do not allege and have no evidence that a single regulation, policy, or order would create a duty to prevent their deaths and injuries if SPC Giffa were not employed by the United States.
(Id. at 7.)
The Court finds this case distinguishable from the facts in Leleux. Leleux failed to identify any regulation that would have imposed a duty upon the Navy to know or monitor the sexual health or activities of their employees. Leleux, 178 F.3d at 758. In contrast, Plaintiffs in the instant case have identified multiple regulations, adopted by both the Army and the Department of Defense, that impose a duty upon the Army with regard to families of servicemembers facing domestic violence. (Dkt. # 15 at 19-29.)
The United States also argues that none of these regulations impose an "independent, antecedent duty unrelated to the employment relationship between the tortfeasor and the United States." Id. at 757. That argument also fails. While the Fifth Circuit has not spoken on this exact question, the Court finds the Sixth Circuit's rationale: that factual assurances by the Army to Dawn Larson Giffa regarding her protection from her husband, heard by or relayed to the Farinas, are sufficient to create such an "independent, antecedent duty unrelated to the employment relationship between [SPC Giffa] and the United States" persuasive. Id.; see also Wilburn v. United States, 616 Fed. Appx. 848, 859 (6th Cir. 2015).
The facts of the Sixth Circuit case, Wilburn, are closely analogous to the facts here. In Wilburn, the estranged wife of a military police officer for the Army, Tracy Wilburn, and her friend were murdered by the officer, Brent Burke, and the estates and immediate family members of the two women brought survival and wrongful death claims against the United States through the FTCA. Id. at 850. The Sixth Circuit held that the Army's assurances to Tracey Wilburn that they would protect her sufficed to create a relationship, like the one in Sheridan, independent of Burke's employment relationship with the Army because those promises could have just as well been to protect her "from a non-employee, a vicious animal, or a non-human hazard" as from a member of the Army itself. Id. at 859.
The instant case is similar to the facts of Wilburn with regard to the creation of that relationship. As in Wilburn, there were documented acts of domestic violence prior to the murders, and local law enforcement was called. Id. at 851. Like SPC Giffa, Burke was ordered to the barracks for a "cooling off" period. Id. Like SPC Giffa, no *468 inquiry was made into whether personal weapons were secured, and nothing was filed so as to indicate to a seller that selling a gun to Burke would be inappropriate. Id. Like Dawn Larson Giffa, Tracey Wilburn spoke with her husband's commanding officer and other officials in the Army chain of command regarding his behavior. Id. The Court finds these facts create a relationship between Dawn Larson Giffa and the Army that survives the intentional tort exception because it: (1) did not arise out of the battery committed; and (2) was independent of its employment relationship with her husband.
Beyond the rationale advanced in Wilburn, it can be argued that the Army assumed the duties of local law enforcement with regard to the conduct of off-base officers at Fort Hood, and that such an assumption creates an independent duty to civilian third parties, and that there are genuine issues of material fact as to whether such a duty existed at the time of these events. The incidents in this case occurred off-base, in Killeen, Texas. Ordinarily, the local police department, KPD, would be the organization called to protect Dawn Larson Giffa and her neighbors. However, as pled here, KPD explicitly refused to exercise jurisdiction over the domestic violence incident that predated the murder of Dawn Larson Giffa and her neighbors due to SPC Giffa's status as a member of the Army. (Dkt. # 15 at 7.) Army Regulation ("AR") 608-18 requires a Memorandum of Agreement ("MOA") between "Army installations and adjoining local communities" in order to address "problems of spouse and child abuse within military [f]amilies." AR 608-18, 2-12. Should a civilian agency refuse to enter into such an agreement, the installation must notify the Assistant Chief of Staff for Installation Management. Id. According to the complaint, both the Department of the Army and the City of Killeen, Texas, initially indicated that no such MOA exists, in violation of AR 608-18. (Dkt. # 15 at 7.) After further discovery, however, it was revealed that there is a MOA between Fort Hood and KPD, and between Fort Hood and the Bell County District Attorney's Office. (Id. ) Therefore, in a case such as this, where the local police department refuses to exercise jurisdiction over an individual because of his military ties, but there is an explicit MOA between the local police department and the military, military law enforcement has to adopt the posture of local law enforcement: they owe a duty to serve and protect third party civilians. To say otherwise would be to allow members of the armed services to behave with impunity, with no actual avenue for relief after the fact for those injured.
Similarly, the Department of Defense regulations, which underscore how seriously the Department takes domestic violence and child abuse, function as rights with no remedies if suit cannot be brought to enforce them. Simply put: the contents of the MOAs between KPD and Fort Hood and the Bell County District Attorney's Office and Fort Hood create genuine issues of material fact as to the duties owed by military police to military families and surrounding civilians residing off-base. Thus, here, the question of whether Dawn Larson Giffa "reasonably relied on the Army's assertion that it would protect her," Wilburn, 616 Fed. Appx. at 859, and whether the Army negligently undertook its duty to protect her pursuant to Army and Department of Defense regulations are all genuine issues of material fact that preclude summary judgment. Additionally, based on the reasons outlined infra, the Court finds that the FTCA intentional tort exception does not apply.
II. Texas Negligence Law
The United States also argues that the negligence claims alleged by *469 Plaintiffs fail as a matter of state law. "Whether the United States owed an independent duty to the plaintiffs is [also] a question of Texas state law." Bodin, 462 F.3d at 489 (5th Cir. 2006). The United States argues that there is no liability under state law for a private employer on these facts, (Dkt. # 24 at 8-9), though it concedes that "Texas recognizes that a duty to use reasonable care may arise 'when a person undertakes to provide services to another, either gratuitously or for compensation.' " (Id. at 8, quoting Kuentz v. Cole Systems Group, Inc., 541 S.W.3d 208, 213 (Tex. App.-Houston 2017).)
The Court disagrees. As noted supra, the Army and Department of Defense regulations here give rise to such a duty, and those duties would arise in the context of a private employer as well. The United States' reliance on cases arguing that federal internal procedures do not give rise to a duty under state law, see, e.g., Tindall v. United States, 901 F.2d 53, 56 fn.8 (5th Cir. 1990), is inapposite: as Plaintiffs note, this is not a claim of a private right of action for failure to follow federal regulations; rather, it is a claim for negligent undertaking, grounded in state common law tort, which renders a party liable for breach of a duty voluntarily assumed by affirmative conduct-enacting the regulations and acting under color of them. (Dkt. # 28 at 17; see also Restatement 2d of Torts §§ 323, 324A (1965).) Thus, there is no Texas-law bar to this action.
The United States also concedes that negligent undertaking is a viable tort in Texas, see Torrington v. Stutzman, 46 S.W.3d 829, 838-39 (Tex. 2000). To establish a claim of negligent undertaking, Plaintiffs must show that: (1) the Defendant undertook to perform services that it should have known were necessary for the protection of the Plaintiffs; (2) Defendant failed to exercise reasonable care in performing those services; (3) Plaintiff relied upon Defendant's performance; or (4) Defendant's performance increased Plaintiff's risk of harm. Id.; see also Restatement 2d of Torts §§ 323, 324A (1965). Plaintiffs cite to numerous deposition materials from various Army personnel that, in their view, establish that the Army's own understanding was that the policies in place at the time of the incident did establish a duty to Dawn Larson Giffa and those close to her, that the Army undertook to fulfill that duty, and that the Army failed exercise reasonable care, and, in doing so, increased the risk of harm. (Dkt. # 28 at 9-14.) The United States disputes that account, and questions whether any Army personnel were on notice of the danger Dawn Larson Giffa was in and whether any procedures were followed improperly. (Dkt. # 24 at 11-12; 12-14.) In addition, the United States contends that Plaintiffs cannot prove reliance on the alleged undertaking nor an increased risk of harm. (id. at 14-17, 17-19.)
This dispute, however, goes directly to the factual issues at the heart of this case. The United States fails to prove, as a matter of law, that Plaintiffs have no case for negligent undertaking under Texas law. Plaintiffs and the United States rely on different portions of the same deposition testimony as evidence of their claims. Ascertaining which interpretation of the facts controls on each of these issues requires a mini-trial on the merits. Whether Plaintiffs can sustain their burden to prove that there was a negligent undertaking by the Army to enforce the duty owed to Dawn Larson Giffa and her neighbors is a question for the trier of fact. Therefore, the motion for summary judgment must be denied.
CONCLUSION
In light of the foregoing, Plaintiffs have successfully made out a claim under the *470 FTCA, based on Texas law, for negligent undertaking by the United States and have successfully raised genuine issues of material fact such that summary judgment is inappropriate. Defendant's motion for summary judgment is, therefore, DENIED .
IT IS SO ORDERED.

This case was transferred from the docket of the Honorable Lee Yeakel to this Court on October 30, 2018. (Dkt. # 36.)

The operative complaint in this case is the Third Amended Complaint. (Dkt. # 15.)

Technically, because the Giffas lived off-base, local police did have jurisdiction over the incident. The operative complaint alleges that, based on Fort Hood's size and the number of soldiers who live off-base, civilian authorities defer to military authorities when a service member is accused of criminal activity. (See id. at 7.)

Dawn Larson Giffa and her son, K.L., were and are both Legal Permanent Residents of the United States and citizens of Canada.

Plaintiffs do not allege that SPC Giffa was acting within the scope of his office or employment during the shooting, rather, they allege that his commanding officer and other members of the Army who were responsible for helping Dawn Larson Giffa after the domestic violence incident was reported were acting within the scope of theirs and negligently undertook those duties. (See Dkt. 15.)